**UNITED STATES of America**

**v.**

**Jack L. SIMMS, Jr.**

**Crim. A. No. 79–20032–07.**

United States District Court,
W. D. Louisiana.

June 10, 1980.

J. Ransdell Keene, U. S. Atty., John P. Lydick, Michael H. Wainwright, Mimi Methvin, Asst. U. S. Attys., Shreveport, La., for United States of America.

Raleigh Newman, Fred Book, Jr., Lake Charles, La., for Jack L. Simms, Jr.

HEEBE, Chief Judge, Eastern District of Louisiana (Sitting by Designation):

This cause came on for hearing on a previous day on the motion of defendant, Jack L. Simms, Jr., for judgment of acquittal or, in the alternative, for new trial.

The Court, having heard the arguments of counsel and having studied the legal memoranda submitted by the parties, is now fully advised in the premises and ready to rule. Accordingly,

IT IS THE ORDER OF THE COURT that the motion of the defendant, Jack L. Simms, Jr., for judgment of acquittal be, and the same is hereby, DENIED. Furthermore,

IT IS THE ORDER OF THE COURT that the motion of the defendant, Jack L. Simms, Jr., for a new trial be, and the same is hereby, GRANTED.

## REASONS

The defendant, Jack L. Simms, Jr., was convicted on one count of conspiracy to violate 42 U.S.C. § 1973i(c), as proscribed by 18 U.S.C. § 371, and one count of a substantive violation of 42 U.S.C. § 1973i(c).[1] Defendant now moves this Court to overturn his conviction and to grant a judgment of acquittal or, in the alternative, to grant a new trial in the above-captioned matter. Defendant contends that the evidence in this case is insufficient to establish his guilt beyond a reasonable doubt and that the evidence is not inconsistent with every reasonable hypothesis of the defendant's innocence. Defendant argues that a miscarriage of justice will result unless the Court either grants a new trial or issues a judgment of acquittal.

This criminal action arose as a consequence of defendant's activities pertaining to a primary election held on September 16, 1978 in Leesville, Louisiana. On the ballot for that date were candidates for Representative to the United States Congress. However, also at stake in this election was a seat upon the State District Court for which defendant's father, Jack Simms, Sr., was a candidate. The defendant was convicted on charges of illegal activities in connection with his father's candidacy for the state judiciary.

---

1. 42 U.S.C. § 1973i(c) proscribes the commercial payment of voters in any election in which a federal office is at stake.

The original indictment was returned in this matter on July 20, 1979 charging defendant, along with eight co-defendants, with one count of conspiracy to violate 42 U.S.C. § 1973i(c) and fourteen counts of substantive violations of this statute. On August 30, 1979, the defendant was severed for trial from the other co-defendants. Thereafter, on September 10, 1979, the Grand Jury returned a fifteen-count superseding indictment charging defendant with substantially the same offenses as previously charged. The following November 15, 1979, the Grand Jury returned a second superseding indictment against defendant on the same offenses as previously charged but which reduced the number of substantive violations from fourteen to one and narrowed the purpose of the conspiracy to that of obtaining votes only for Jack Simms, Sr. Defendant was tried upon this indictment and a conviction was returned on December 14, 1979.

Defendant filed the instant motion for judgment of acquittal or, in the alternative for new trial, on December 21, 1979. Oral arguments were heard in this matter and the case was taken under submission on January 15, 1980. Thereafter, the Court allowed defendant and the government to file supplemental memorandum upon the completion of the trial transcript. On March 21, 1980, this Court permitted defendant to file an additional memorandum in response to a previous brief submitted by the government. The Court is now prepared to rule.

### THE EVIDENCE

The second superseding indictment returned against the defendant on November 15, 1979 states that a purpose of the conspiracy charged, among others, was to obtain votes for Jack L. Simms, Sr. in the primary election of September 16, 1978. Accordingly, at trial the government sought to prove by circumstantial evidence that defendant had knowingly and intentionally entered into a conspiracy to purchase votes for his father in the September 16th primary election and that voters were actually paid for their votes in this election. The defense, however, contended that the evidence failed to establish that defendant had engaged in any activities pertaining to the purchase of votes and, in fact, indicated that defendant did not conspire to purchase votes but merely arranged to secure drivers to haul voters to the polls on election day.

Testimony taken during the government's evidence in this matter revealed that Jack L. Simms, Jr. was campaign manager for his father in the September election for Judge on the State District Court in Leesville, Louisiana. The government established that prior to the election defendant had contacted Ray Pynes, a long-time friend and associate, and had made an inquiry about obtaining assistance for his father in the upcoming election. The defendant was concerned about the chance of success for his father in a predominately black neighborhood of Leesville, known locally as the "Crossings", and sought Pynes' aid in enlisting support for Jack Simms, Sr. within this section of the community. Specifically, the evidence showed that defendant contacted Pynes primarily in an effort to secure the support and commitment of a political organization headed by Willie Fisher, a well-known figure among the residents of the Crossings.

The Government established that the Willie Fisher organization was engaged in vote-buying activities in the Crossings. Fisher testified that his organization supported candidates for several offices in the September election. Specifically, the evidence indicated that Fisher endorsed a ticket composed of Claude "Buddy" Leach, a candidate for United States Representative; Robert Pynes, a candidate for office on the Vernon Parish School Board; and Bill Tilley, a candidate for District Attorney of Vernon Parish. The Fisher organization was composed of individuals who had agreed to drive voters to the polls on election day on behalf of these candidates for a set fee. The evidence showed that the drivers would supply the voter with a slip of paper on which were written the numbers of the candidates endorsed on the Fisher

ticket. After the voter had cast his ballot, that individual would be taken to a prearranged location where he or she was paid $10.00 for their vote. The drivers were paid $100.00 for their participation in the operation.

Ray Pynes had been closely involved in the Fisher organization from its inception. Pynes helped arrange for the financing to support the organization and recruited drivers to haul voters to the polls. At trial, the government contended that defendant knew of Pynes' involvement and direct participation in these vote-buying activities. Both Robert Pynes and William C. Hilton testified that the defendant knew of the existence of the Fisher vote-buying organization and was aware that Fisher and Ray Pynes were conspiring to purchase votes in the September election. However, defendant categorically denied that he had any knowledge of the existence of such a vote-buying scheme and testified that his only intention in contacting Ray Pynes was to obtain support for his father's candidacy and to enlist drivers on behalf of his father for election day.

Willie Fisher testified that the defendant had approached him with a request to "help him out" and "organize the drivers and put his [father's] number on the ticket". When this effort failed, the evidence established that at defendant's request Ray Pynes spoke with Fisher in a further attempt to secure his support for Jack Simms, Sr. However, Fisher declined to directly endorse Mr. Simms, preferring to remain uncommitted in the race for District Judge. Testimony indicated that political considerations also dictated the exclusion of Jack Simms, Sr. from the official ticket endorsed by Fisher. The Fisher organization was already committed to endorsing both Leach and Tilley, who had previously announced their support for Ted Broyles, a candidate for District Judge against Jack Simms, Sr. Furthermore, Mr. Simms was supporting Clay Tillman against Bill Tilley in the race for District Attorney from Vernon Parish. Under these circumstances, according to Pynes' testimony, Willie Fisher declined to place Jack Simms, Sr. on the official Fisher ticket.

Although Fisher did not guarantee Ray Pynes that he would place Jack Simms, Sr. on the endorsed ticket, Fisher did approve a plan wherein individual drivers within the Fisher organization could drive for Jack Simms, Sr. at their own discretion. The evidence showed that defendant had previously agreed to pay any drivers $50.00 each to drive for his father in the primary election. At Pynes' suggestion, Fisher promised to solicit drivers for Jack Simms, Sr. with the understanding that each driver would be compensated $50.00 by the defendant in addition to what they would receive for their services in support of the official ticket.

The government established that a meeting of all drivers participating in the Fisher operation was held on the evening of September 15, 1978, the night before the primary election, at the home of Ray Pynes. Testimony revealed that neither defendant, nor his father, was present at this meeting, although Ray Pynes stated that defendant had been informed of the gathering. Both Pynes and Fisher acknowledged that the purpose of the conference was to finalize plans for the vote-buying operation scheduled for the following day. To this end, the identity of the pay-houses, where voters would be paid for their votes, were disclosed and the drivers were paid in advance for their services. Envelopes were distributed to each driver containing $100.00 and the official Fisher ticket. Ray Pynes testified that of the $100.00 each driver received, he had advanced $50.00 and the remaining $50.00 had been contributed by Leach and Tilley. The ticket, which contained the numbers of the endorsed candidates, was to be distributed to the voters as they rode to the polls on election day.

At this meeting, the evidence showed that Fisher contacted a number of drivers on behalf of Jack Simms, Sr. Fisher testified that he spoke with the drivers concerning the election for District Judge and informed them that an additional $50.00 per person would be paid to anyone who wished

to drive for defendant's father. Fisher also stated that he offered $25.00 per person for anyone who wished to drive on behalf of Ted Broyles in the same election. According to Fisher's testimony, the option was left with the individual driver to decide whether to carry Jack Simms, Sr., Ted Broyles, or neither candidate on the ticket for election day.

Ray Pynes testified that approximately eighteen (18) to twenty (20) persons agreed to drive for defendant's father at the September 15th meeting. Included among this group was Roger Dale Hickman, Willie Fisher's nephew, who stated that Fisher asked him to drive for Jack Simms, Sr. and told him that he would be paid $50.00 for his services on behalf of Mr. Simms. Hickman agreed to this proposal and was paid by Ray Pynes on behalf of the defendant. The evidence showed that Pynes had personally fronted the money to pay the drivers at the meeting to drive for Mr. Simms.

Julious Robinson, an associate of Willie Fisher, was also present at the September 15th meeting and testified that he too agreed to drive for defendant's father. The evidence indicated that Robinson had been involved in the planning stages of the Fisher operation and was familiar with vote-buying in the Crossings. On direct examination, Robinson stated that the defendant had visited him prior to the election to request his assistance in obtaining drivers and otherwise preparing for his father's candidacy. However, Robinson contended that he referred defendant to Ray Pynes because Robinson was supporting Tilley, not Jack Simms, Sr.'s candidate, Tillman, for District Attorney. Nonetheless, Robinson testified that he contacted drivers on defendant's behalf and actually carried defendant's father on his ticket election day. Robinson stated that he did not receive a pay envelope at the September 15th meeting, but was compensated by Ray Pynes after the election for his services on behalf of Jack Simms, Sr.

On election day morning, at approximately 1:30 A.M., the government established that defendant met with Ray Pynes at Pynes' home. According to Pynes' testimony, the defendant was concerned about the success of the drivers' meeting held earlier that evening and inquired as to the prospects for his father's election in the Crossings later that day. The evidence showed that at this time defendant gave Pynes a paper sack containing $1,500.00, in five and ten dollar bills, and Pynes testified that defendant told him this money was "to use for his dad the next day". The following morning, Pynes stated that he brought this money to Undine Webb's home, utilized as a pay-house in the operation, and added it to the pot previously collected the evening before, for use in the purchase of voters at that location.[2]

The testimony at trial indicated that Jack Simms, Sr. had withdrawn $5,000.00 in cash from the bank on September 15, 1980, the day before the election. Mr. Simms had requested that this money be given to him in denominations of five and ten dollar bills. Upon obtaining this cash, Jack Simms, Sr. gave defendant $2,500.00, a portion of which defendant's father understood to be for an interest payment on an outstanding loan owed by defendant. The evidence established that the $1,500.00 given to Ray Pynes in the early morning hours of election day by defendant originated from the withdrawal made by defendant's father. At trial, defendant contended that this money was intended to be used only to pay the drivers who had agreed to drive for defendant's father. Defendant denied that the money was given to Pynes to purchase votes for Jack Simms, Sr.

The evidence offered by the government at trial of this matter established that on election day Roger Dale Hickman, at the request of Willie Fisher, drove for Jack

---

2. Approximately $4,000.00 was collected at the September 15, 1980 meeting to finance the Fisher operation. Of this amount, one-half was supplied by Robert and Ray Pynes and one-half was advanced on behalf of Tilley and Leach.

From this pot, the drivers had been paid the $100.00 for their participation in the scheme. The balance was taken by Willie Fisher to be used at the pay-house for the purchase of votes.

Simms, Sr. and was paid $50.00 for his services by Ray Pynes. According to Hickman's testimony, he carried Mr. Simms' number on the ticket in addition to those candidates officially endorsed by Fisher. As Hickman picked-up each voter, he would hand that person the ticket and explain to them that they would be paid $10.00 for their vote. After the individual had voted, Hickman would then drive the voter to the pay-house where each voter would be paid. Hickman testified that he drove approximately nineteen (19) to twenty (20) persons to the polls on election day and stated that "just about all of them" were paid for their votes.

Erma Lee Gill was one of the voters driven by Hickman to the polls on the day of the primary election. The evidence showed that Ms. Gill had been walking near her home in the evening of election day when Hickman drove past and inquired if Ms. Gill had been to vote. Erma Lee Gill testified that she had heard people were being paid $10.00 to vote and she asked Hickman if this were true. When Hickman confirmed this fact, Ms. Gill agreed to drive with Hickman to the polls and to vote. As she entered the car, Ms. Gill stated that Hickman handed her a small piece of paper upon which were written the numbers of several candidates for office. According to Ms. Gill's testimony, she voted for these candidates and was then taken by Hickman, along with several other voters Hickman had also driven to the polls, to a home where she was paid $10.00 for her vote. Ms. Gill identified the location of the pay-house as being the home of Undine Webb's.

The government established, through the testimony of Ray Pynes and Willie Fisher, that on election day morning a barbecue stand owned by Fisher in the southern end of Leesville was used as a pay-house to pay voters who lived in this section of the community. Ray Pynes, Willie Fisher, Roger Dale Hickman and Julious Robinson all testified that they saw defendant, Jack L. Simms, Jr., at the barbecue stand election day morning. Pynes stated that he had informed defendant the night before that the barbecue stand was to be used as a

pay-house and that he would be there in the morning. According to Pynes and Fisher, defendant remained at the barbecue stand for approximately fifteen to twenty minutes and asked "how everything was going" and inquired about the voter turnout. Roger Dale Hickman testified that the defendant was present when he came to the barbecue stand to collect money to pay a voter. Although defendant admitted that he was at the stand for a short time on election day, he denied that any vote-buying activities were conducted in his presence or that he had any knowledge of such activities as may have been conducted at the barbecue stand. Furthermore, defendant denied, and the evidence showed, that he was not present at Undine Webb's home later in the day.

Ray Pynes testified that the money he paid to the drivers on behalf of Jack Simms, Sr. was reimbursed by defendant several weeks after the election at Ray Pynes' store. Pynes contended that defendant gave him $800.00 to cover his costs in securing drivers for defendant's father on election day. Thus, according to Pynes' testimony, the defendant gave him a total of $2,300.00 to obtain drivers and to pay voters on behalf of Mr. Simms. Pynes further stated that after the investigation into this matter was begun, defendant notified Pynes that he had not told federal investigators of the money that defendant had given to Pynes. Defendant denied that these conversations and meetings occurred.

In summary, the government based its case against defendant on the strength of the following testimony: (1) that Simms contacted Ray Pynes and requested his aid in the September 16, 1978 primary election on behalf of his father; (2) that Simms asked Pynes to approach the Fisher organization on behalf of his father; (3) that Simms knew Pynes and Fisher were involved in vote-buying operations; (4) that Pynes spoke with Fisher and obtained his approval of a plan to obtain drivers for Mr. Simms; (5) that at Pynes' request, Fisher asked drivers to drive for Jack Simms, Sr. in the primary election; (6) that Roger Dale

Hickman agreed to drive for Mr. Simms; (7) that Hickman carried Erma Lee Gill to the polls election day and entered Jack Simms, Sr.'s number on his ticket; (8) that Ms. Gill voted for those candidates recommended by Hickman and was paid $10.00 for her vote; (9) that Hickman was paid $50.00 to drive for Jack Simms, Sr.; (10) that Simms gave Ray Pynes $1,500.00 to pay voters to vote for his father on election day; (11) that later, Simms gave Pynes another $800.00 to reimburse him for the cost of obtaining drivers on behalf of his father; and (12) that defendant was present at a pay-house election day and that voters were paid in his presence.

Defendant now moves this Court for a judgment of acquittal or, in the alternative, for a new trial, on the contention that the evidence does not warrant conviction.

### JUDGMENT OF ACQUITTAL

■ In the district court, the test on a motion for judgment of acquittal is to determine whether, taking the view most favorable to the government, a reasonably-minded jury could accept the relevant evidence as adequate and sufficient to support the conclusion that the defendant was guilty beyond a reasonable doubt.[3] *United States v. DeJean*, 613 F.2d 1356 (5th Cir. 1980); *United States v. Wieschenberg*, 604 F.2d 326 (5th Cir. 1979); *United States v. Warner*, 441 F.2d 821 (5th Cir.), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). On a motion for judgment of acquittal, it is not for the court to assess credibility, weigh evidence, or draw inferences, but rather the court must view the evidence in the light most favorable to the government. *See: United States v. Malatesta*, 590 F.2d 1379 (5th Cir.) (en banc), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979). However, this does not require complete judicial abdication to the jury, for the conviction must be supported by substantial evidence. *United States v.*

*Salinas-Salinas*, 555 F.2d 470 (5th Cir. 1977); *United States v. Peterson*, 488 F.2d 645 (5th Cir.), *cert. denied*, 419 U.S. 828, 95 S.Ct. 49, 42 L.Ed.2d 53 (1974).

■ In determining the sufficiency of the evidence, the test is not whether the evidence excludes every reasonable hypothesis other than that of guilt, but whether reasonable minds could conclude that the evidence is inconsistent with defendant's hypothesis of innocence. *See: United States v. Wieschenberg, supra; United States v. Fredericks*, 586 F.2d 470 (5th Cir. 1978), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979); *United States v. Black*, 497 F.2d 1039 (5th Cir. 1974). Stated another way, the test is whether a reasonably minded jury *must* have had a reasonable doubt. *United States v. Barrera*, 547 F.2d 1250 (5th Cir. 1977). In this respect, the standard of review of the sufficiency of the evidence is the same whether the evidence is direct or circumstantial. *United States v. Houde*, 596 F.2d 696 (5th Cir. 1979); *United States v. Placios*, 556 F.2d 1359 (5th Cir. 1977).

■ The determinative question in a consideration of defendant's motion for judgment of acquittal focuses upon the sufficiency of the evidence to support defendant's conviction of conspiracy to purchase votes in violation of 42 U.S.C. § 1973i(c). Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act. *Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975); *United States v. Alvarez*, 610 F.2d 1250 (5th Cir. 1980); *United States v. Cuesta*, 597 F.2d 903 (5th Cir. 1979). The prohibition of conspiracy is directed not at the unlawful object, but at the process of agreeing to pursue that object. Thus, conspiracy is a separate offense from the actual substantive crime envisioned. However, a party to a conspiracy may be responsible for the substantive acts committed by a

---

**3.** Appellate courts place great emphasis upon finding that a conviction is supported by substantial evidence, taking the view most favorable to the government and finding all reasonable inferences and credibility choices in favor of the jury verdict. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Austin*, 585 F.2d 1271 (5th Cir. 1978).

co-conspirator in furtherance of the conspiracy even though that party does not participate in the substantive offense or have any knowledge of this offense. *See: Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Rosado-Fernandez,* 614 F.2d 50 (5th Cir. 1980). Therefore, where, as in the instant case, a defendant does not physically participate in the substantive offense, his association with such an act depends exclusively upon the charge of conspiracy. Accordingly, should the evidence fail to establish defendant's participation in the conspiracy, his conviction on *both* counts must be set aside.

To support a conviction of conspiracy there must be proof of (1) an agreement between two or more persons, (2) an unlawful purpose, and (3) an overt act committed by one of the conspirators in furtherance of the conspiracy. *United States v. Wieschenberg, supra; United States v. White,* 569 F.2d 263 (5th Cir.), *cert. denied,* 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978). Specifically, the Fifth Circuit has held that:

> "To sustain a conviction under 18 U.S.C. § 371, the prosecution must demonstrate an unlawful agreement and at least one independent act in furtherance of the agreement. [The government] need not show that the conspirators committed the substantive crime which is charged in the indictment as the object of the conspiracy. *Yates v. United States,* 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). Nor is it necessary to substantiate each of the overt acts alleged in the indictment. *Bradford v. United States,* 413 F.2d 467 (5th Cir. 1969)." *See: United States v. Williams,* 474 F.2d 1047, 1047–1048 (5th Cir. 1973), *Per Curiam.*

A defendant does not join a conspiracy merely by participating in a substantive offense or by associating with persons who are members of a conspiracy. *United States v. Carlton,* 475 F.2d 104 (5th Cir.), *cert. denied,* 414 U.S. 842, 94 S.Ct. 100, 38 L.Ed.2d 80 (1973); *Panci v. United States,* 256 F.2d 308 (5th Cir. 1958). Mere knowledge, approval or acquiescence in the object or purpose of a conspiracy does not make one a conspirator. *United States v. Edwards,* 488 F.2d 1154 (5th Cir. 1974).[4] Conspiracy does not proscribe purely a mental state, but rather requires that there be a definite agreement and an act in furtherance of that agreement. *See: United States v. Alvarez, supra.* The conspirator must knowingly and intentionally agree to join others in a concerted effort to bring about some common end. A conspirator need not know all of the details of the plan, but he must be aware of the essential nature and scope of the enterprise and he must intend to participate in such a plan. *United States v. Conroy,* 589 F.2d 1258 (5th Cir. 1979), *cert. denied,* 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1980). Thus, as Judge Rubin noted in *United States v. Alvarez, supra* at 1255:

> "It is not enough that a defendant may have wittingly aided a criminal act or that he may have intended to do so in the future; to convict a defendant of conspiracy the government must demonstrate that the defendant agreed with others that together they would accomplish the unlawful object of the conspiracy..."

An essential element of the crime of conspiracy is the criminal intent of the participant to enter into the illegal agreement. For the crime to be proved, there must be evidence sufficient to warrant belief beyond a reasonable doubt that the defendant intentionally entered into an agreement to do an illegal act with the intention of consummating that act. *Unit-*

---

4. The United States Supreme Court has recognized this fact and has held that courts must guard against the blanket prohibition of the association with a conspiratorial group. *See: Scales v. United States,* 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). Nevertheless, a modern trend adopted by some courts has been to permit a defendant's presence at the scene of the crime or his association with conspirators to serve as sufficient evidence of his knowing participation in a conspiracy where there are suspicious circumstances and the existence of the conspiracy is independently established. *See: United States v. Dalzotto,* 603 F.2d 642 (7th Cir. 1979); *United States v. Giese,* 597 F.2d 1170 (9th Cir. 1979). This rule has to date seen limited application in only the more extreme factual circumstances.

ed States v. Alvarez, supra; United States v. Suarez, 608 F.2d 584 (5th Cir. 1979). To sustain a conviction on a conspiracy charge, the government must establish that the conspirators had at least that degree of criminal intent necessary for the commission of the substantive offense itself. *Ingram v. United States*, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959); *United States v. Bankston*, 603 F.2d 528 (5th Cir. 1979); *United States v. Malatesta, supra.* Mere knowledge of the object or purpose of the conspiracy, without the intention and agreement to cooperate in the crime, is not sufficient to establish one as a conspirator. *See: United States v. Richardson*, 596 F.2d 157 (6th Cir. 1979).

■ Persons who enter into a conspiracy to commit a criminal offense seldom do so openly and secrecy and concealment are the hallmarks of this offense. As such, the elements of agreement and intent are rarely susceptible of direct proof and generally a conspiracy can only be established by circumstantial evidence of the acts and conduct of the alleged conspirators and the inferences reasonably deduced from this evidence that logically warrant the conclusion that an unlawful agreement, expressed or implied, existed. *United States v. Evans*, 572 F.2d 455 (5th Cir.), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978; *United States v. Perez*, 489 F.2d 51 (5th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3047, 41 L.Ed.2d 664 (1974). Thus, the ordinary acts and conduct of the alleged conspirators themselves in furtherance of the purpose of the conspiracy may serve as a basis from which an agreement to join a criminal conspiracy can be inferred. *See: United States v. Crockett*, 534 F.2d 589 (5th Cir. 1976). However, not every act of a party that assists in the accomplishment of the objective of the conspiracy is a suffi-

cient basis to infer on his behalf an agreement to join the conspiracy. *See: United States v. Alvarez, supra.* Rather, the co-conspirator must "in some sense promote [the] venture himself, make it his own, have a stake in its outcome." *United States v. Falcone*, 109 F.2d 579, 581 (2nd Cir.), *aff'd*, 311 U.S. 205, 60 S.Ct. 1075, 84 L.Ed. 1393 (1940). The defendant must have at least demonstrated an intent to further promote and cooperate in the illegal activity. *Direct Sales v. United States*, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943); *United States v. Alvarez, supra.*[5]

■ Although a conspiracy may be shown by either direct or circumstantial evidence, *United States v. Frick*, 588 F.2d 531 (5th Cir.), *cert. denied*, 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 385 (1979), there must still be proof of a common purpose and plan to establish that a defendant has joined in a conspiracy. *See: United States v. Harbin*, 601 F.2d 773 (5th Cir. 1979). The government need not prove that a defendant knew of all of the facts of the scheme, *United States v. Evans, supra*, or knew of the identity of each of the co-conspirators, *United States v. Ochoa*, 609 F.2d 198 (5th Cir. 1980), or played parts of equal importance or activity with other persons within the conspiracy. *United States v. Bryant*, 364 F.2d 598 (5th Cir. 1966). The evidence need merely show that each defendant possessed full knowledge of the conspiracy's general scope and purpose. *United States v. Michel*, 588 F.2d 986 (5th Cir.), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979); *United States v. Becker*, 569 F.2d 951 (5th Cir.), *cert. denied*, 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978).[6]

■ Nonetheless, to establish a conspiracy, the evidence must show that a particular defendant willfully associated himself

---

5. In certain instances a defendant may be convicted for participation in an illegal conspiracy despite the fact that he performs only a single function or a single act in association with the conspiracy. Where it is established that the defendant knew of the conspiracy and deliberately associated himself with it, a single act may suffice to sustain a conviction. See: *United States v. Ochoa*, 609 F.2d 198 (5th Cir.

1980); *United States v. Kirk*, 534 F.2d 1262 (8th Cir.), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1174, 51 L.Ed.2d 581 (1976).

6. Such knowledge must be clear and unequivocal, but can be inferred from the circumstances and conduct of the parties involved. *United States v. Conroy, supra.*

with the criminal venture, participated in it and sought by some act to make it succeed. *United States v. Netterville*, 553 F.2d 903 (5th Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 189, 54 L.Ed.2d 135 (1977), 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978). In other words, the prosecution must show beyond any reasonable doubt that the defendant had "the deliberate, knowing, specific intent to join the conspiracy." *United States v. Morado*, 452 F.2d 167, 175 (5th Cir.), *cert. denied*, 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972). The government must show by substantial evidence that there was an agreement understood by the defendant, to which he was a party and to which he meant to be a party. *See: United States v. Alvarez, supra; United States v. Muller*, 550 F.2d 1375 (5th Cir. 1977). As the Fifth Circuit recently noted, "It is not enough for [the government to merely] establish a climate of activity that reeks of something foul." *United States v. Wieschenberg, supra* at 331–332. Only if the totality of the evidence adequately shows a concert of action, with all the parties working understandingly, with a single design for the accomplishment of a common purpose, then an agreement to commit some illegal act, coupled with an overt act in furtherance of the scheme, will create a conspiracy. *United States v. Marable*, 574 F.2d 224 (5th Cir. 1978).

■ In making out the crime of conspiracy, once the unlawful agreement is established, proof of a single act in furtherance of that agreement by a single conspirator will sustain a conviction of guilty for each member of the conspiracy. *United States v. Vettre*, 591 F.2d 347 (5th Cir. 1979); *United States v. Fuiman*, 546 F.2d 1155 (5th Cir.), *cert. denied*, 434 U.S. 856, 98 S.Ct. 176, 54 L.Ed.2d 127 (1977). It is unnecessary to show that any other conspirator was present at the commission of that overt act. Where the conspiracy has been established, and an individual linked to it, an overt act committed by any one of the conspirators is properly chargeable to everyone involved. *Braverman v. United States*, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942); *United States v. Netterville, supra.*

Similarly, as previously discussed, a party to a conspiracy may be responsible for a substantive offense committed by a co-conspirator in furtherance of the conspiracy, even should the party not directly participate in the commission of the substantive offense or have any knowledge of it. *United States v. Michel, supra; United States v. Rosado-Fernandez, supra.* Once the conspiracy and a particular defendant's knowing participation in it has been established beyond a reasonable doubt, that defendant is deemed guilty of substantive acts committed in furtherance of the conspiracy by any of his criminal partners. *United States v. Sullivan*, 578 F.2d 121 (5th Cir. 1978). The rational for this form of vicarious liability is based upon the common purpose shared by the co-conspirators as "partners-in-crime" and results in the law treating the act of one conspirator as an act for all. *See: United States v. Michel, supra.*[7]

■ The evidence presented against defendant in this case, when viewed in the light most favorable to the government, is sufficient to sustain defendant's conviction of conspiracy to violate 42 U.S.C. § 1973i(c) and his illegal purchase of votes as proscribed by this statute. The defendant was charged with and convicted of conspiracy to purchase votes at the September 16, 1978 primary election. The testimony of Willie Fisher, Ray Pynes, Julious Robinson, Robert Pynes and Roger Dale Hickman positively established that the Fisher organization was engaged in an illegal conspiracy to purchase votes in this election. Robert Pynes testified that the defendant knew that the Fisher organization was involved in vote-buying operations. (Tr. 261–262)

---

**7.** Note, however, that if the co-conspirator's act does not fall within the scope of the unlawful purpose of the conspiracy, or if the act was part of the ramifications of a plan which could not reasonably be foreseen as a necessary or natural consequence of the illegal conspiracy, then members of the conspiracy may not be found guilty of substantive offenses based upon the commission of such acts. *United States v. Moreno*, 588 F.2d 490 (5th Cir.), *cert. denied*, 441 U.S. 936, 99 S.Ct. 2061, 2168, 2169, 60 L.Ed.2d 666 (1979).

This testimony was corroborated by that of William Charles Hilton, who stated that the defendant had discussed vote-buying operations in the Leesville area with him and had decided to enlist the aid of the Pynes-Fisher organization. (Tr. 202–204) Thus, accepting this evidence, the defendant approached Ray Pynes with full knowledge of the existence and purpose of the Fisher organization.

Ray Pynes testified that the defendant asked him to support Mr. Simms in the September 16, 1978 election and requested him to enlist the aid of the Fisher organization on behalf of his father. (Tr. 15–17) The defendant told Pynes that he "would put up whatever was necessary" for his participation in Fisher's operation. (Tr. 20) Defendant told Pynes to inform Fisher that he "would provide a fifty dollar bonus in excess of what the drivers were being paid as an incentive to help his father." (Tr. 21) Ray Pynes was asked:

"Q. What else was discussed with Mr. Simms, Jr. concerning the money for drivers or for voters?

A. He told me that, that he would, whatever it took, that for me to go ahead and handle it and if I needed it then he would give it to me then . . ." (Tr. 22)

The evidence indicated that Ray Pynes contacted Willie Fisher and requested Fisher's assistance in helping Jack Simms, Sr. on election day. Fisher spoke with several drivers on behalf of the defendant at a meeting held at Ray Pynes' home on September 15, 1978. At that time, a large number of drivers agreed to drive for Jack Simms, Sr. Julious Robinson stated that he agreed to support defendant's father and carried Mr. Simms on his ticket the following day. (Tr. 281) Roger Dale Hickman also agreed to support Mr. Simms and to place defendant's father on his ticket election day. According to Hickman, he hauled approximately "nineteen or twenty" voters and "just about all of them" were paid for their votes. (Tr. 137)

In the early morning hours of September 16, 1978, the defendant visited Ray Pynes at his home after the driver's meeting of the night before had ended. Pynes recalled defendant's visit:

"Q. What did you talk about?

A. We talked about how the meeting went. He asked me how the meeting went. I told him it went fine. He asked me was I satisfied that, did I think, in fact, his dad was going to carry District Two. And I told him I thought he would.

Q. And did anything else happen during that meeting with Mr. Simms?

A. Yes, sir.

Q. And what was that?

A. He gave me—he said he wanted to give me some money to use for his dad the next day.

Q. And did he, in fact, give you any money?

A. Yes, sir, he did.

 * * * * * *

Q. And how much money was in the sack?

A. Fifteen hundred dollars.

 * * * * * *

Q. And what did Mr. Simms say when he gave you the money?

A. This is to use for dad tomorrow." (Tr. 23–24)

At this time, Pynes mentioned to the defendant that he would be at Fisher's barbecue stand the following morning, one of the sites utilized by the Fisher organization as a pay-house for the vote-buying operation election day. Willie Fisher, Ray Pynes, Julious Robinson and Roger Dale Hickman all testified that the defendant was at the barbecue stand during the morning hours of September 16, 1978. Hickman remembers that the defendant was present on one occasion when a voter was being paid for voting in the election. (Tr. 137) Ray Pynes also stated that voters were receiving money for their votes while the defendant was present. (Tr. 301)

After the election, Ray Pynes stated that he received an additional $800.00 from the defendant to reimburse him for the money

paid to the drivers election day. (Tr. 36) Thus, according to Pynes, the defendant paid a total of $2,300.00 for the assistance of the Fisher organization in the primary election. Even assuming that all thirty drivers utilized by Fisher actually drove for defendant's father at $50.00 per driver,[8] this would leave $800.00 unaccounted under defendant's position that he only paid for drivers to haul voters to the polls, not to purchase votes for his father. The government argued that the only use these extra funds could have had was to purchase votes election day. Under the facts viewed most favorably to the government, the jury could reasonably infer such a conclusion.

In consideration of defendant's motion for judgment of acquittal, the Court finds that reasonable minds could, and in fact did, conclude that the evidence presented is inconsistent with the hypothesis of innocence presented by defendant. Despite defendant's contentions that he did not know of the vote-buying scheme, the government's evidence placed defendant at a pay-house election day where he witnessed the actual purchase of votes. The defendant gave Ray Pynes $1,500.00 in five's and ten's and then an additional $800.00, for a total expenditure in excess of what would otherwise be required had defendant solely paid for drivers from the Fisher organization. Testimony was offered to indicate that the defendant was aware of vote-buying activities in the "Crossings" and the participation of Pynes and Fisher in these operations, but defendant nonetheless sought to enlist the aid of both Pynes and Fisher in securing support for his father in the primary election. Under these facts, a reasonable mind could conclude that the defendant knowingly and intentionally conspired to purchase votes at the September 16, 1978 election.

Similarly, through defendant's contact with Ray Pynes, there is substantial evidence to find that the defendant not only entered into an agreement to purchase votes, but that he committed several acts in furtherance of this plan. Pynes, Hickman,

Fisher and Robinson all agreed to assist defendant and thus established proof of a common purpose and plan to purchase votes for defendant's father. Both Hickman and Robinson testified that they carried Mr. Simms' number on their tickets and that they purchased votes in accordance with the scheme. Thus, overt acts were committed in furtherance of the conspiracy and are chargeable to the defendant. In the same manner, it was reasonable for the jury to conclude that defendant was guilty of the substantive offense actually committed by Hickman, as it was in furtherance of the conspiracy and naturally resulted from the plan to purchase votes. Accordingly, based upon an analysis of the evidence presented in the light most favorable to the government, the Court must deny defendant's motion for judgment of acquittal.

## MOTION FOR NEW TRIAL

In the alternative, defendant, Jack L. Simms, Jr., has filed a motion for a new trial. Essentially, defendant maintains that he did not receive a fair trial and that the verdict was against the weight of the evidence. The motion presented by defendant is extremely broad. Defendant argues that (1) the evidence, when viewed as a whole, does not establish guilt beyond a reasonable doubt; (2) the conduct of the prosecution, in certain respects, was prejudicial; (3) certain evidentiary rulings of the Court were erroneous; (4) the jury was biased by adverse publicity of previous trials of vote-buying defendants; (5) the defendant had insufficient time for the adequate preparation of his defense in this case; (6) the government failed to prove venue in this action; and (7) the Court erred in submitting written charges to the jury with certain portions underlined. Ruling on this motion was taken under advisement and is herein submitted below.

██ The standard applicable to a motion for a new trial is different from that used in determining whether a defendant is entitled to a judgment of acquittal. *United*

---

8. Ray Pynes estimated that at most, some eighteen to twenty drivers agreed to drive for defendant's father at the meeting held September 15, 1978. (Tr. 21)

States v. *Hurley*, 281 F.Supp. 443 (D.Conn. 1968). As previously noted, in a motion for judgment of acquittal the court must determine whether, taking the evidence in the light most favorable to the government, the jury must have a reasonable doubt as to the guilt of the accused. If no such doubt necessarily exists under that view of the evidence, the motion for judgment of acquittal must be denied. *United States v. Barrera, supra; United States v. Wieschenberg, supra.* However, a motion for a new trial may be granted if required in the "interest of justice." Rule 33, F.R.Cr.P.; *See: United States v. Narciso,* 446 F.Supp. 252 (E.D.Mich.1977). Thus, the court's power in ruling upon a motion for a new trial is significantly broader than that available in considering a motion for judgment of acquittal.

█ Motions for new trial are based either on the grounds that the verdict was against the weight of the evidence or that some error was committed by the court or the prosecution which substantially affects the rights of the accused. *See: United States v. Neff,* 343 F.Supp. 978 (E.D.Pa. 1972), *aff'd,* 475 F.2d 861 (3rd Cir. 1973); *United States v. Narciso, supra.* Where the motion contends that the verdict was against the weight of the evidence, the motion is directed to the sound discretion of the trial court. *United States v. Antone,* 603 F.2d 566 (5th Cir. 1979); *United States v. Riley,* 544 F.2d 237 (5th Cir. 1976), *cert. denied,* 430 U.S. 932, 97 S.Ct. 1554, 51 L.Ed.2d 777 (1977). Under its broad power, the court may weigh the evidence and consider the credibility of the witnesses. *See: United States v. Phifer,* 400 F.Supp. 719 (E.D.Pa.1975), *aff'd,* 532 F.2d 747 (3rd Cir. 1976). These motions are directed to the "conscience of the court" which must carefully evaluate the inferences and credibility of the evidence to determine whether a

miscarriage of justice may have resulted. *United States v. Gross,* 375 F.Supp. 971 (D.N.J.), *aff'd,* 511 F.2d 910 (3rd Cir. 1974), *cert. denied,* 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249 (1975), 429 U.S. 829, 97 S.Ct. 89, 50 L.Ed.2d 93 (1976). Should the court find that the verdict is contrary to the evidence, or to its weight, and that a miscarriage of justice has resulted, the court may then set aside the verdict and grant a new trial.

█ The remedy of granting a new trial on these grounds is sparingly used, with most courts couching their decision in terms of the "exceptional case." *See: United States v. Pepe,* 209 F.Supp. 592, 595 (D.Del. 1962), *aff'd,* 339 F.2d 264 (3rd Cir. 1964). Thus, courts are not free to simply reweigh the evidence and set aside a jury verdict because a judge may feel that some other result is more reasonable. *Tennant v. Peoria & P. U. Ry. Co.,* 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520 (1944). However, where a court finds that a miscarriage of justice may have occurred at trial, this is classified as such an "exceptional case" as to warrant granting a new trial in the interests of justice. *United States v. Parelius,* 83 F.Supp. 617 (D.Hawaii 1949); *United States v. Phifer, supra.*[9]

█ Clearly, the court must proceed with great caution in examining a motion for new trial; but to insure that justice is done, courts are extended the broadest possible inquiry into the nature of the challenged proceeding. *See: United States v. Allen,* 554 F.2d 398 (10th Cir.), *cert. denied,* 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977). This power is so encompassing that some courts even go so far as to say that the trial court sits, in effect, as a 13th juror to protect the interests of justice. *United States v. Caramandi,* 415 F.Supp. 443 (E.D. Pa.1976); *United States v. Narciso, supra; United States v. Phifer, supra.*[10] The trial

9. Those courts which view motions for new trial with disfavor generally confine their concern to motions based on newly discovered evidence, particularly where a substantial lapse of time may hamper the retrial of the matter. *Weiss v. United States,* 122 F.2d 675 (5th Cir.), *cert. denied,* 314 U.S. 687, 716, 62 S.Ct. 300,

478, 86 L.Ed. 500, 570 (1941); *United States v. Harris,* 534 F.2d 1371 (9th Cir. 1976); *United States v. Smith,* 179 F.Supp. 684 (D.D.C.1959).

10. But *see Fortenberry v. New York Life Ins. Co.,* 459 F.2d 114, 117 (6th Cir.), *cert. denied,* 409 U.S. 981, 93 S.Ct. 316, 34 L.Ed.2d 245

judge has the responsibility of safeguarding the integrity of the jury trial, *United States v. Gainey*, 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965), and even a single error during the trial process could, if of sufficient magnitude, warrant a new trial. *See: United States v. Narciso, supra*; 2 Wright, Federal Practice and Procedure: Criminal § 556 (1969).

▮ In addition to examining the evidence, the trial court, on a motion for new trial, has equally broad powers to examine errors which may have been committed during the course of the trial. Where such a motion is presented based upon these grounds, the convicted defendant has the burden of showing that (1) some error was in fact committed and (2) that such error was prejudicial to him. *United States v. Basen*, 308 F.Supp. 65 (E.D.Pa.1970); *United States v. Neff, supra*. In these circumstances, even if an error is found to exist, it will be disregarded as harmless unless found to affect defendant's "substantial rights" and the fairness of the trial. *See:* Rule 52(a), F.R.Cr.P.; *Gregory v. United States*, 365 F.2d 203 (8th Cir. 1966), *cert. denied*, 385 U.S. 1029, 87 S.Ct. 405, 17 L.Ed.2d 307 (1967).

▮ The test to determine whether an error is of sufficient magnitude to warrant a new trial is to discover whether the court can conclude with a fair assurance, after carefully examining all of the facts of the case, that the verdict was substantially swayed by the error. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). As noted by the Sixth Circuit:

"... the question is, not whether any actual wrong resulted ... but whether [there was] created a condition from which prejudice might arise or from which the general public would suspect that the jury might be influenced to reach a verdict on the ground of bias or

prejudice." *Stone v. United States*, 113 F.2d 70, 77 (6th Cir. 1940).

The decisive factors for consideration are (1) the closeness of the case; (2) the centrality of the issue affected by the error; and (3) the steps taken to mitigate the effect of the error. *Gaither v. United States*, 413 F.2d 1061 (D.C. Cir. 1969). The court must insure that not merely a just result was obtained in a trial, but that the result, whatever it be, was reached in a fair way. *See: United States v. Narciso, supra.*[11]

▮ Defendant seeks a new trial herein because he contends that the verdict was against the weight of the evidence and that specified errors were committed by the Court and the prosecution during the trial which prejudiced his rights and prevented him from securing a fair trial. Defendant's primary argument is that the evidence, when viewed as a whole, failed to establish defendant's guilt beyond a reasonable doubt. Defendant maintains that the evidence offered at trial is not inconsistent with his hypothesis of innocence and did not show any knowing participation on his part in a conspiracy to purchase votes for his father in the September 16, 1978 primary election.

This Court has already reviewed the evidence presented at trial of this matter upon consideration of defendant's motion for judgment of acquittal. However, as previously discussed, the Court was therein bound to examine the evidence in that light most favorable to the government, with all credibility choices and inferences left within the exclusive province of the jury. Under this test, the Court found that the government's evidence, if believed and accepted by the jury, would support a finding that defendant was guilty of conspiracy beyond a reasonable doubt and that such evidence was inconsistent with defendant's hypothesis of innocence.

---

(1972) (dissenting opinion), which states that a federal trial judge does not sit as a 13th juror and may not weigh credibility in considering a motion for new trial.

**11.** However, the court does not have to insure a "perfect trial." *Brown v. United States*, 411

U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). Errors which do not substantially effect a defendant's rights are permissible as long as the trial is dictated by considerations of fundamental fairness.

Now the Court is called upon to examine the evidence under a different standard wherein the Court has broad power to evaluate all of the testimony and to make such credibility choices and inferences as are reasonably dictated by the record. Thus, the Court's discretion to review the evidence is much wider upon motion for new trial than on judgment of acquittal. The reason for this distinction lies in the differing effects upon the trial process the two rulings have.

"In directing a judgment of acquittal, the Court makes a final disposition of the case. On the other hand, in setting the verdict aside the Court merely grants a new trial and submits the issues for determination by another jury. It is appropriate in the latter instance, that the Court should have wide discretion in the interest of justice." *See: United States v. Narciso, supra* at 304.

To justify defendant's conviction for conspiracy in this matter, there must be substantial evidence that Jack L. Simms, Jr. deliberately and knowingly agreed to enter into a conspiracy to purchase votes for his father in the September 16th primary election. However, there is no direct proof in the transcript of this proceeding which shows that the defendant knowingly and intentionally entered into such a conspiracy.

Ray Pynes testified that defendant had asked him to "support" his father for Judge in the primary election. (Tr. 15–16) In an effort to enlist the aid of the Fisher organization, defendant requested that Pynes speak with Fisher. Mr. Pynes was asked to explain the nature of the understanding that evolved between defendant, Fisher and himself:

"Q. What was discussed between yourself, Mr. Fisher and Jack Simms, Jr.?

A. About carrying, supporting Jackie's father for district judge.

Q. And what was agreed to between the three of you?

A. Willie said that he would find out, or Willie told Jackie and I that he would find out how many drivers that he actually could get to support Jackie's father." (Tr. 17)

Fisher related his conversation with Ray Pynes concerning defendant:

"Q. Did you ever have any discussion with either one of the Pynes brothers about Mr. Simms?

A. Mr. Ray asked me would I talk to some of the drivers the night before the election out at his home. Well, I talked to some of the drivers about helping out Mr. Simms, and the ones that I knowed would help Mr. Simms, he would take care of them." (Tr. 91–92)

Thus, Fisher testified that he helped secure *drivers* on behalf of Jack Simms, Sr. at Ray Pynes' request.

Pynes spoke to the defendant at length about the financial aspects of securing the aid of the Fisher organization:

"Q. Did you discuss finances with Mr. Simms, Jack Simms, Jr.?

A. Yes, sir.

Q. And what did you discuss?

A. Jackie told Willie and myself the day that we went to see Willie that he would put up whatever was necessary.

Q. Did you discuss the number of drivers that you would be able to arrange to carry for Jack Simms, Sr.?

A. No, sir, I did not. I did not know the number at that time.

 * * * * * *

Q. Now, did you discuss with Jack Simms breakdowns of money between drivers and voters at any time?

A. Yes, sir. He told me for me to tell Willie that he would provide a fifty dollar bonus in excess of what the drivers were being paid as an incentive to help his father.

 * * * * * *

Q. What else was discussed with Mr. Simms, Jr. concerning the money for drivers or for voters?

A. He told me that, that he would, whatever it took, that for me to go ahead and handle it and if I needed it then he would give it to me then, or—and I told him I didn't because I didn't know what it was going to take. I didn't at the time, I didn't know how many drivers. He told me to keep a record of it." (Tr. 20–23)

Fisher himself spoke with the defendant on one occasion also about financial matters:

"Q. When the defendant, Jack Simms, Jr., came by and talked to you, did he refer to money in the pot?

A. Well, he said you come on and help. And I said why don't you get some of your own helpers up there. He said, well, I haven't got no confidence in them. He said we got the money in the pot if we can get you to go along with us and help him . . ." (Tr. 114)

\* \* \* \* \* \*

Q. During your discussions with Jack Simms, Jr., did you discuss how much the voters would be paid or the fact that the voters would be paid?

A. We didn't talk about that. He just asked me to help him. I told him I wasn't having nothing to do with it." (Tr. 115)

Thus, although defendant stated that he would place funds in the "pot" to secure the assistance of Fisher's organization, defendant did not discuss the actual purchase of votes with Fisher; rather, he only spoke to him directly about obtaining drivers for his father on election day.

The clear import of this testimony is that defendant agreed to join the Fisher operation to obtain drivers on behalf of his father. Neither Fisher, nor Ray Pynes, with whom defendant primarily dealt, stated that Jack Simms, Jr. specifically requested anyone to purchase votes for his father. Despite being asked to directly comment upon defendant's conversations about the purchase of votes, both Fisher and Pynes could only remark on defendant's efforts to secure drivers. The mere fact that defendant sought the aid of an organization later proven to be engaged in vote-buying activities cannot, alone, establish defendant's guilt of conspiracy to purchase votes. Mere association with a criminal group, without knowledge of the illegal purpose and the intent to join, is insufficient to support a conviction of conspiracy. In the instant case, the conclusion that defendant knowingly and intentionally agreed to purchase votes can only be reached from compound inferences based upon the testimony of witnesses whose credibility is, in some instances, suspect.

William Charles Hilton testified that defendant had met with him on two prior occasions at which time defendant inquired about joining the Hilton organization to purchase votes for his father. Hilton testified that Simms understood that a "pot" included funds for vote-buying and that the defendant wished to contribute to such a venture on behalf of his father. (Tr. 201–202) However, Hubert Monk was present at the meeting first discussed between Hilton and defendant and Mr. Monk testified that vote-buying was not discussed in the presence of Mr. Simms. (Tr. 244)

Robert Pynes also testified that defendant was aware of Robert's vote-buying activities in the past and stated that defendant knew that Willie Fisher played an integral part in the vote-buying operation during the past elections. (Tr. 261) Nonetheless, Robert could not state that defendant specifically requested his aid to engage in the purchase of votes. Instead, Pynes noted that defendant ". . . had asked me to help his daddy . . . and . . . to do what I could to get Willie Fisher to help his daddy." (Tr. 260)

The money used to finance the vote-buying operation conducted by Fisher was collected on September 15, 1978 at the drivers meeting held at the home of Ray Pynes. According to the testimony of Robert Pynes, approximately $4,000.00 was gathered to be placed into the "pot" used for the

purchase of votes election day. One-half of this amount was funded by Tilley and Cabra and the other half was fronted by the Pynes brothers. (Tr. 268) Although defendant knew of this meeting, neither he nor his father was present and no contribution was made by defendant to the pot at this time. (Tr. 52, 269, 305) The money collected that evening was taken the following day to Undine Webb's home where it was used to pay voters for their vote.

On election day morning, at approximately 1:30 A.M., Ray Pynes met with defendant at Pynes' home. At that time, Pynes testified that defendant gave him $1,500.00 "to use for his dad" the next day. (Tr. 24) Despite the implications of this late night visit, Pynes did not state that anything was discussed about the purchase of votes. The only question the defendant asked was about the success of the meeting earlier in the evening and the prospects for his father's election that day. Pynes stated that this money was later taken to Undine Webb's where he added it to the pot collected the night before.

Perhaps the most damaging evidence offered to defendant's hypothesis of innocence was the testimony of his presence at Willie Fisher's barbecue stand election morning. Ray Pynes stated that defendant had visited for a short time early in the day.

"Q. How long did the defendant stay at the barbecue?

A. Not very long, twenty minutes.

Q. What, if anything, was discussed with the defendant while you were at the barbecue?

A. He simply asked me how everything was going. I told him I thought it was going fine. He asked me how the turnout was. I said I think it's good." (Tr. 26)

Fisher was at the stand election morning and he also recalled seeing Jack Simms, Jr. with Ray Pynes. (Tr. 99) But Fisher did not remember seeing the defendant with anyone else during his visit, contrary to the recollection of Pynes, who testified that Roger Dale Hickman stopped at the stand to pay off a voter in defendant's presence.

"Q. Now, while you were at Willie's Barbecue in the morning hours you mentioned that Jack Simms was down there with you, is that correct?

A. Yes, sir, he came in.

Q. And you testified that voters, either drivers or voters came in, is that correct?

A. Yes, sir.

Q. Did voters or drivers receive money at that time?

A. Yes, sir, they did.

Q. Was Jack Simms, Jr. in a position to see the transfer of money?

A. Yes, sir, he was." (Tr. 301)

At the trial of this matter, Hickman recalled the incident:

"Q. That morning, where did you carry the voters to get paid?

A. Down to Willie's Barbecue Place.

Q. Who was there when you went there?

A. Mr. Ray Pynes?

Q. Was there anyone else there on any occasion?

A. Yes, sir.

Q. And who else was there?

A. Mr. Simms.

\* \* \* \* \* \*

Q. Okay. What happened when you got to the barbecue on that occasion, what did you do?

A. Well, I told him I had one voter in the car.

Q. You told who?

A. Mr. Pynes.

\* \* \* \* \* \*

Q. And what did he do?

A. Got up, went behind the counter and gave me the money and I left.

\* \* \* \* \* \*

Q. Where was the defendant, Mr. Simms, at the time that this happened?

A. He was sitting at a table." (Tr. 136–137)

However, on cross-examination, Hickman admitted that he had testified to the Grand Jury that only Ray Pynes and Willie Fisher were present in the barbecue stand on this occasion. (Tr. 146) Hickman had no explanation for his failure to mention defendant's presence before the Grand Jury, other than to note that his testimony at the trial was the correct version. On the other hand, the defendant denied that he had any knowledge of such vote-buying activities or that he witnessed any purchase of votes at any time.[12]

The evidence presented by the government in this matter does not convincingly establish defendant's guilt of conspiracy to purchase votes beyond a reasonable doubt. The government's case depends upon inferences upon inferences drawn from uncorroborated testimony that, upon careful scrutiny, is subject to questions of credibility. The only evidence that defendant actually intended to organize a conspiracy to purchase votes for his father is based upon inferences drawn from his comments that he "would put up whatever was necessary" to secure the aid of the Fisher organization in the primary election. However, such comments, alone, can hardly support defendant's conviction, especially in consideration of the fact that in each instance, the defendant was discussing obtaining drivers for his father—not the purchase of votes. Merely because defendant may have had some association with an organization engaged in a conspiracy to commit some illegal act is insufficient to sustain defendant's conviction. The evidence must show some actual intent to participate in this activity.

The government argues that defendant's visit to Ray Pynes in the early morning hours of September 16th and his presence at the barbecue later that same day are evidence of defendant's involvement in the conspiracy. However, even Pynes failed to state that defendant gave him the $1,500.00 with any indication that it was to be used for the purchase of votes. In fact, the actual pot used to pay voters had been collected earlier that evening at a meeting of which defendant knew, but did not attend. As to defendant's presence at the barbecue, only Ray Pynes testified uncontradicted that Simms was present while voters were being paid. Fisher did not remember defendant being present on such occasions and Hickman had told the Grand Jury that Simms was not even at the barbecue.

Essentially, the outcome of this case depends upon the weight and credibility extended to the testimony of the government's witnesses. In consideration of defendant's motion for judgment of acquittal, the Court recognized that the jury was free to make whatever inferences and credibility choices it felt were warranted from the testimony introduced at trial. The jury accepted the testimony of the government's witnesses and found defendant guilty as to both counts charged. Being unable to review the weight of the evidence and the credibility of the witnesses on judgment of acquittal, this Court denied defendant's motion and found sufficient evidence, when viewed most favorably to the government, to support the jury's determination beyond a reasonable doubt. However, the Court cannot, in good conscience, reach this same decision upon consideration of defendant's motion for new trial.

The evidence presented by the government is marked by uncertainties and discrepancies which fail to prove defendant's participation in an illegal conspiracy beyond a reasonable doubt when viewed in its totality. However, the Court recognizes that defendant's activities in this instance are not above suspicion and that, had there been more direct evidence as to defendant's intent and knowledge of the conspiracy, this might have dictated a different result. Nevertheless, where there is even the slightest chance that a miscarriage of justice may have occurred, as is the case here,

12. Julious Robinson also testified that he saw defendant at the barbecue stand election day, but neither Fisher, Pynes or Hickman remember Robinson as being present and Robinson himself admitted to lying to the Grand Jury on another point. Accordingly, the Court dismisses Robinson's testimony as being of insufficient weight and credibility.

the Court is obligated in the interest of justice to order a new trial. The defendant is entitled to a fair trial with a just result based upon the evidence presented. Where there is any doubt that the evidence fully supports a jury determination, a new trial is the appropriate remedy to insure defendant the full extent of his rights.

The Court's determination that defendant is entitled to a new trial in this matter does not solely rest upon the conclusion that a possible miscarriage of justice may have occurred. Additionally, the Court believes that an error was committed upon the submission of written jury charges to the jury with certain portions of the charge underlined, thereby unduly emphasizing that section of the charge to defendant's prejudice. Together, these two findings created a condition which prevented defendant from obtaining a fair trial upon the evidence presented and in the context of the conduct of the trial.

At the conclusion of this case, the Court gave the following charge on the law of conspiracy and the requirements necessary to establish evidence of a conspiracy:

"The evidence in the case need *not* show that the alleged members of the conspiracy entered into any express or formal agreement; *or* that they directly stated between themselves the details of the scheme and its object or purpose, *or* the precise means by which the object or purpose was to be accomplished. Similarly, the evidence in the case need *not* establish that *all* of the means or methods set forth in the indictment were in fact agreed upon to carry out the alleged conspiracy, *or* that all of the means or methods which were agreed upon were actually used or put into operation. Neither must it be proved that *all* of the persons charged to have been members of the conspiracy were such, *nor* that the alleged conspirators actually succeeded in accomplishing their unlawful objectives.

What the evidence in the case *must* show beyond a reasonable doubt is:

(1) That two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the indictment;

(2) That the defendant willfully and knowingly became a member of such conspiracy;

(3) That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the means or methods (or 'overt acts' described in the indictment; and

(4) That such 'overt act' was knowingly committed at or about the time alleged in an effort to effect or accomplish some object or purpose of the conspiracy." (Submitted Jury Instructions, p. 9)

The defendant contended that the submission of written charges to the jury with the key words relative to the law of conspiracy underlined constituted clear error. The government, however, argued that it was within the Court's discretion to submit written instructions to the jury and that the submission of the above charge was not such error as to warrant the granting of a new trial.

■■■ The question of whether a criminal charge should be reduced to writing and furnished to the jury for their use in their deliberations is discretionary with the trial court. *McDaniel v. United States,* 343 F.2d 785 (5th Cir.), *cert. denied,* 382 U.S. 826, 86 S.Ct. 59, 15 L.Ed.2d 71 (1965). *See also: United States v. Johnson,* 466 F.2d 537 (8th Cir. 1972), *cert. denied,* 409 U.S. 1111, 93 S.Ct. 921, 34 L.Ed.2d 693 (1973); *United States v. Brighton Building & Maintenance Co.,* 598 F.2d 1101 (7th Cir.), *cert. denied,* 444 U.S. 840, 100 S.Ct. 79, 80, 62 L.Ed.2d 52 (1979). Similarly, the trial judge has substantial latitude in tailoring the jury instructions so long as they fairly and adequately cover the issues presented. *United States v. James,* 576 F.2d 223 (5th Cir. 1978). Nonetheless, the Court must be cautious not to overemphasize any one part of the charge or otherwise direct the jury's attention to an isolated segment of the instructions. *See: United States v. Schilleci,* 545 F.2d 519 (5th Cir. 1977).

In the *Schilleci* opinion, the Fifth Circuit expressed disapproval of the practice of furnishing the jury with written instructions and noted that such a custom may constitute reversible error where the court failed to instruct the jury to consider the charge as an integrated whole. The Court found that the submission of written charges was conductive to dissection of the charge by the jury and was suspect to the likelihood of undue concentration of specific sections of the instructions. However, the Court indicated that the submission of written charges alone would not constitute error without other additional factors attributing to prejudice to the defendant. This latter view was affirmed in *United States v. Hooper*, 575 F.2d 496 (5th Cir.), *cert. denied*, 439 U.S. 895, 99 S.Ct. 256, 58 L.Ed.2d 242 (1978), decided after *Schilleci*, in which the Fifth Circuit found that where the jury was adequately instructed to consider the charge as a whole, a copy of the instructions could be submitted at the trial court's discretion.

 In reviewing any challenge to the adequacy of the court's jury instructions, the court must examine the charge in its entirety. *See: United States v. Brooks*, 611 F.2d 614 (5th Cir. 1980); *Beck v. United States*, 317 F.2d 865 (5th Cir. 1963), *cert. denied*, 375 U.S. 972, 84 S.Ct. 480, 11 L.Ed.2d 419 (1964). The trial judge may assist the jury in charging them to arrive at a just verdict by explaining and commenting upon the evidence and by drawing the jury's attention to that part of the charge that the judge may think is important. *United States v. James, supra.* However, the court may not single out any one area that might create prejudice to any defendant in the case. *See: United States v. Arguelles*, 594 F.2d 109 (5th Cir.), *cert. denied*, 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 81 (1979).

In the instant matter, the questioned portion of the charge was adopted word-for-word from the Pattern Criminal Jury Instructions of the Fifth Circuit and contained underscores of certain words that were similarly emphasized in the pattern charges. The charge itself is a clear statement of the law of conspiracy and defendant does not contest the substance of these instructions. Rather, defendant's objection centers upon the underscoring of select portions of this charge.

Although this instruction is taken directly from the Fifth Circuit's recommended charges, the Court does not find this fact dispositive of the issue herein presented. The instructions constitute a recommendation only and have not been formally adopted by the Fifth Circuit as the official criminal instructions which the individual trial courts are bound to follow. Instead, the pattern charges were meant to aid the trial judge in the preparation and submission of jury instructions. They do not constitute rigid guidelines to which the trial court must adhere and their use does not guarantee that a court's charges will be free from error.

The Court concludes that the underscoring of certain words contained in the written instructions submitted to the jury in this matter created a condition from which prejudice to the defendant may have resulted. At every instance that a word was underlined, language was highlighted which emphasized the government's presentation of evidence in the case and their theory of defendant's participation in the conspiracy. Although the substance of the charge sets forth the applicable law of conspiracy, the underscoring of certain words in that charge may have had the affect of focusing the jury's attention upon only the government's presentation of the issues. Because of the closeness of the evidence in this matter and due to the centrality of the issues affected by the Court's error, there is substantial danger that the verdict may have been swayed by the undue attention drawn to those portions of the underscored charge. Due to the seriousness of these issues, and the chance of prejudice to the defendant, coupled with the Court's earlier finding that a miscarriage of justice may have resulted, defendant's motion for new trial is granted.

**1210**

### CLOSING REMARKS

The evidence in this matter, when viewed most favorably to the government, and with all credibility choices left within the province of the jury, dictates that the Court deny defendant's motion for judgment of acquittal. However, upon review of defendant's motion for new trial, the Court is free to make its own analysis of the credibility of the witnesses and may draw those inferences from the testimony that are reasonable under the existing circumstances. Given this broad power of review, and the fact that a motion for new trial is directed to the sound discretion of the trial judge, the Court believes that in the interest of justice, in order to protect defendant's right to a fair trial, defendant's motion should be granted. The combined effect of the failure of the evidence to positively establish defendant's guilt beyond a reasonable doubt and the possible prejudice created by the submission of underscored instructions to the jury require this Court to grant defendant's motion for new trial. Because of this decision, the Court does not consider defendant's further contentions that the Court erred in other respects sufficient to entitle defendant to a new trial. The Court has cautiously reviewed the conduct of defendant's trial and finds that no error was committed by either the Court or the prosecution in any respect other than that discussed in this opinion.