
# IN THE SUPREME COURT OF GUAM

**PEOPLE OF GUAM,**
Plaintiff-Appellant,

**v.**

**PHILIPS JAMES SABLAN,**
Defendant-Appellee.

Supreme Court Case No.: CRA21-009
Superior Court Case No.: CF0248-20

## OPINION

## Cite as: 2023 Guam 4

Appeal from the Superior Court of Guam
Argued and submitted on March 25, 2022
Via Zoom video conference

Appearing for Plaintiff-Appellant:
Sean E. Brown, *Esq.*
Assistant Attorney General
Office of the Attorney General
Prosecution Division
590 S. Marine Corps Dr., Ste. 801
Tamuning, GU 96913

Appearing for Defendant-Appellee:
David J. Highsmith, *Esq.*
Assistant Public Defender
Public Defender Service Corporation
779 Route 4
Sinajana, GU 96910


**E-Received**
4/10/2023 10:31:18 AM

BEFORE: F. PHILIP CARBULLIDO, Chief Justice; ROBERT J. TORRES, Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.[1]

**MARAMAN, J.:**

[1]     Defendant-Appellee Philips James Sablan was convicted by a jury of Second Degree Criminal Sexual Conduct ("CSC") (as a First Degree Felony) in violation of 9 GCA § 25.20(a)(1) for touching the genital area of minor M.T.G.  Nine-year-old M.T.G. testified, leading to the parties' dispute about the admission and effect of potential Guam Rule of Evidence 404(b) ("prior act") evidence.  The trial court doubted the jury properly disregarded M.T.G.'s stricken testimony when it convicted Sablan, so it granted Sablan a new trial per 8 GCA § 130.20(a)(1).  The People appealed, arguing the trial court abused its discretion.  We reverse the trial court's grant of a new trial.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Pretrial Events

[2]     Sablan was indicted for two crimes alleged to have occurred "[o]n or about the period between April 1, 2020 and April 30, 2020, inclusive."  Record on Appeal ("RA"), tab 12 at 1-2 (Indictment, July 27, 2020).  He was charged with Second Degree CSC (as a First Degree Felony) for "causing [his] hand to touch the primary genital area of M.T.G . . . , a minor under fourteen (14) years of age" and for Indecent Exposure (as a Third Degree Felony) for "intentionally expos[ing] his genitals under circumstances in which his conduct was likely to be observed by any person who would be offended or alarmed."  *Id.*  To incorporate all required elements, the Indecent Exposure charge was amended to clarify Sablan was charged with intentionally exposing his genitals "to M.T.G." and that she was under sixteen years old.  RA, tab 72 at 2 (Am. Indictment,

---

[1] The signatures in this opinion reflect the titles of the justices at the time this matter was argued and submitted.

Apr. 5, 2021).[2] The People maintained the two crimes occurred on or about a single day in April 2020, shortly before M.T.G. told her family and a report was made to the police. The parties seem to agree that five months later, M.T.G. elaborated on Sablan's alleged abuse in an interview with Investigator Frank Santos at the Attorney General's office. Although the record lacks details of Santos's report, evidently M.T.G. stated the indicted incident was not the first sexual touching she recalled; at some time in the past, M.T.G. had been sleeping on an air mattress with her Aunt Lynna and was awakened by Sablan touching her "private." Transcript ("Tr.") at 72-74 (Jury Trial, Mar. 31, 2021).

[3]     Sablan formally requested notice of intention to use 6 GCA § 404(b) ("prior act") evidence. The People did not file notice of intent to use the prior incident for any reason, including under Guam Rule of Evidence ("GRE") 404(b); nor did the People charge Sablan for additional incidents. However, Santos's three-page report was included in the People's discovery, the report was on the People's exhibit list, and Santos appeared on the People's witness list. Sablan included Santos's report in his list of exhibits and included "[a]ny person named on the government's witness list or in the police reports" in his witness list. RA, tab 41 at 2 (Def.'s Ex. List Submission, Dec. 18, 2020); RA, tab 42 at 1-2 (Def.'s Witness List, Dec. 21, 2020). Sablan did not file a pretrial motion *in limine* to exclude information from Santos's report, and during trial, defense counsel read from the report outside the presence of the jury and M.T.G.: "[M.T.G.] stated that other incidents happened when she was four years of age and continued up to when she was eight." Tr. at 64-66, 72-73 (Jury Trial, Mar. 31, 2021). Santos did not testify, and the report was not testified to or offered as evidence.

---

[2] This amendment is not at issue. *See* RA, tab 87 at 4 n.1 (Dec. & Order, Aug. 16, 2021).

**B.  General Testimony**

[4]      M.T.G.'s father has two sisters—Lynna and Penina—and a bedridden brother who lives with Lynna.  Sablan is Lynna's longtime live-in boyfriend; they live in a house they appear to rent together (the "house" or "Lynna's house").  Witnesses explained Sablan was like an uncle to M.T.G.  Lynna testified M.T.G. regularly spent time with her at the house, including overnight, until April 15, 2020.  M.T.G.'s mother testified she and M.T.G. had been close with Sablan and Lynna until the incident.  They had all lived together at the house three years before, and since then had spent regular nights there.  M.T.G.'s father also testified, confirming they went to Lynna's house almost every weekend.  M.T.G.'s father and Lynna work together.

[5]      M.T.G. was nine years old at the time of trial.  She testified to regularly spending time at the house and identified a photo of Sablan's bedroom, noting an airbed was missing.  She described watching TV in Sablan's room, including during times where Sablan changed clothes in his closet.  She stated that when her cousin was present, Sablan would tell them to leave, but when she was alone, he did not.  When asked, "Was there ever a time where you were watching TV in that room and then Uncle Phil came out?", M.T.G. described an incident that occurred when she was on the airbed watching SpongeBob.  Tr. at 50-52 (Jury Trial, Mar. 31, 2021).  She testified, "When he came out of the restroom he was -- he just dropped his towel and then started playing with his private." *Id.* at 52.  On direct examination, M.T.G. clarified that another word for a boy's "private" is "dick," and that Sablan was facing her, he was wearing no clothes, his towel was blue or green, and she could see his "private." *Id.* at 52-53.  She did not know if Sablan knew she was there or wanted her to see him.  M.T.G. testified that she then looked away and ran out of the room to her mom.

[6]      When asked, "Was the time with the towel the only incident with Phil?", M.T.G. replied that it was not. *Id.* at 58. She then described a time when she was sitting on the airbed and Sablan told her to "come and watch" on his phone "the bad things that he want to do." *Id.* As both incidents had occurred while M.T.G. had been sitting on the airbed, the People tried to clarify whether the phone incident was "before or after the towel thing." *Id.* at 59. M.T.G. said it was after, but she could not remember when. M.T.G. also testified that Sablan had once "asked if he can take my underwear and I said no." *Id.* at 61. According to M.T.G., the next day her underwear was missing, and she eventually found it in Sablan's bag.

[7]      The People then elicited the following testimony from M.T.G.:

> Q      Okay. Aside from the towel, the phone thing, and the underwear, did Phil ever do anything else to you?
>
> A      I'm not really sure.
>
> Q      Okay. Do you know if you ever told your mom or your dad or Lynna if he was touching you?
>
> A      No, I didn't because I was really scared.
>
> Q      You didn't tell them, but did he ever touch you?
>
> A      Yes, he did.
>
> Q      Where did he touch you?
>
> A      In my private.

*Id.* at 61-62. When asked to point to where a girl's "private" was, M.T.G. pointed to the top of her thighs. *Id.* at 62.

[8]      M.T.G.'s mother testified that sometimes, M.T.G. had been alone with Sablan at the house. She stated that M.T.G. told both her and her husband about the incidents with Sablan. M.T.G.'s mother explained that M.T.G. told her that M.T.G.'s underwear was missing

and that Sablan hid it. She testified that M.T.G. told Lynna about the incidents the day after M.T.G. reported it to her.

[9]     M.T.G.'s father recalled that it was around 5:30 p.m. on May 4, 2020, when his wife and M.T.G. came to pick him up from work. When all three were in the car, M.T.G. told him "all the details about what happened." Tr. at 23 (Jury Trial, Mar. 31, 2021). He recalled that as M.T.G. recounted what happened, she was crying. M.T.G.'s father later gave a statement to the police saying, "Monday the 5th of [May] my wife and my daughter came to pick me up. My daughter was crying. She said Phil Sablan was -- showed his dick to her and that he was trying to touch her private." *Id.* at 36. M.T.G. and her father then went into the office to tell Lynna what happened. He recalled that M.T.G. continued to cry as she told Lynna what happened, and that Lynna "freaked out." *Id.* at 23-26. M.T.G.'s father testified that after he returned home, he had a phone conversation with Sablan wherein Sablan denied the allegations. He wanted to meet in person, and Sablan did not show up. M.T.G.'s mother testified that they did not initially go to the police because her husband wanted to have Sablan explain what happened to their daughter. M.T.G.'s father said they reported the incident to police at the suggestion of a third sister.

[10]    On the first day of trial, Lynna testified that on May 5, 2020, M.T.G. and her mother came to pick up M.T.G.'s father from work. She testified that M.T.G. had entered Lynna's office crying; when Lynna asked what was wrong, M.T.G. said Sablan stole three pairs of M.T.G.'s underwear, was exposing himself, and was touching her. Lynna testified that M.T.G. told her the incidents had happened "last weekend," but Lynna told M.T.G., "you were not home at my house last weekend." Tr. at 94 (Jury Trial, Mar. 30, 2021).[3] Lynna then told M.T.G. to bring her father to

---

[3] Lynna testified at trial and told police they last visited on April 15 and spent the night. Tr. at 94-97 (Jury Trial, Mar. 30, 2021).

the office "because what she's saying against Philips Sablan is a strong allegation and somebody has to be there." *Id.* at 59. Lynna further testified on the first day of trial that "I asked her if it's true that what she stated against Philips Sablan. . . . She said it was true." *Id.*

[11]    On the fourth day of trial, Lynna testified that on May 13, 2020, M.T.G. had entered her office crying, gave her a hug, and stated, "I'm sorry for any lies to my mom." Tr. at 38 (Jury Trial, Apr. 5, 2021). Lynna interpreted this to be a reference to "the allegation for Philip[s]." *Id.* at 39. On cross-examination, Lynna admitted that she talked to Sablan daily, including over the weekend between her two days of testimony.

[12]    Penina also testified to two similar occurrences. Penina testified that the first time M.T.G. seemed to recant the allegations happened while she and M.T.G. were waiting to talk to an investigator, describing that M.T.G. looked to her "with a teary eye and she said it's not true, auntie. Nothing happened." *Id.* at 63. Penina also depicted another occasion while she and M.T.G. were shopping together and "she mentioned to me that -- out of the blue while waiting in line she said it's not true. Nothing happened." *Id.* at 62. Penina believed M.T.G. was referring to the incident with Sablan; however, she never clarified this. *Id.* at 62, 97.

[13]    Guam Police Department ("GPD") Officer Jessilyn Balajadia testified to briefly interviewing M.T.G., her mother, and Lynna on May 7 and 8, 2020. Balajadia summarized her understanding that M.T.G. last stayed at Sablan's house before the COVID-19 lockdown, the incident happened around dinnertime, M.T.G. reported the incident to her mother, Lynna urged them to go to the police, the relevant towel was blue, and M.T.G. had been watching "SpongeBob." Tr. at 37-39 (Jury Trial, Mar. 30, 2021).

[14]    GPD Officer Eugenius Pewtress testified to interviewing Sablan. Pewtress read Sablan's statement saying that on May 6, 2020, Lynna called him, mad, saying M.T.G. alleged he showed

her his "private." *Id.* at 122. In his statement, Sablan explained he would never show M.T.G. his "private" because he wouldn't jeopardize his friendship with M.T.G.'s father, and he treats M.T.G. like a daughter. *Id.* at 122-23. As Sablan did not testify at trial, the jury heard only M.T.G.'s testimony on the alleged touching.

## C. "Prior Act" Testimony

[15] After M.T.G. testified that Sablan had touched her "private" and pointed to the top of her thighs, the People asked, "How many times did he touch you there?" Tr. at 62 (Jury Trial, Mar. 30, 2021). M.T.G. replied, "When I was sleeping with my Auntie Lynna and then I felt something on my --." *Id.* Defense counsel then objected. At the bench, defense counsel argued M.T.G. had testified to a prior incident the People should have disclosed under GRE 404(b). The prosecutor argued M.T.G. could be describing the indicted incident, and his next question would clarify. In the moment, the prosecutor stated, "it could be a prior," while making the point that no one knew which incident she described. *Id.* at 63. The People were adamant this was not GRE 404(b) evidence and that any inconsistencies between M.T.G.'s testimony and the indictment were impeachable. The court dismissed the jury to rule on the matter.

[16] Defense counsel explained to the judge that M.T.G.'s curtailed testimony sounded much like a past incident described in the Santos report. Defense counsel argued testimony about prior acts prejudiced Sablan as being a chronic offender, violating GRE 404(b) and GRE 403. The People argued this testimony went to the weight and credibility of the victim's testimony, not a specific prior bad act of the defendant. The People added that the indictment's April date range did not restrict testimony to a single day or time and that Sablan could have moved *in limine* to limit the Santos report.

**[17]**     The next day, after an explanation of prior-act case law, the court ruled M.T.G.'s potential description of Sablan's multiple sexual contacts was not inextricably intertwined with the charges and constituted GRE 404(b) other acts.  The court ruled Sablan was not properly notified of this testimony and that the danger of unfair prejudice would substantially outweigh the testimony's probative value under GRE 403.  Therefore, the People were prohibited from asking "how many times" Sablan touched M.T.G.  Tr. at 8 (Jury Trial, Apr. 1, 2021).  The court indicated it would limit the People to eliciting testimony about the single indicted incident.  M.T.G. then retook the stand.

**[18]**     M.T.G.'s second day of testimony was more disjointed.  The prosecutor and M.T.G. had the following exchange, which was later stricken[4] by the trial court:

> Q        . . . . Did you say he touched you on your private?
>
> A      Yes.
>
> Q        Okay.  Was that just before you guys stopped going to Auntie Lynna's house?  Just before you guys stopped going back, no more going back, no more spending the night.
>
> A      Yes.
>
> . . . .
>
> [Sidebar with attorneys]
>
> . . . .
>
> Q        Oh, I'm sorry.  You were talking about being touched.  What happened?
>
> A        When he touched me the time that he touched me I went outside, and then that time I was going to eat breakfast or dinner or lunch.  And then I asked my uncle if I can watch on the TV and he said go ahead.  And then I fell asleep.

---

[4] We address the propriety of striking this testimony below.

Q      And what happened next?

A      When I woke up the time is nighttime and then later when my mom and dad was going to go to the store at nighttime and my auntie was going to go sit in the room but I was going to be in there.  He followed me and he –

Q      What happened next?

A      He followed me and he -- and that time it was like nighttime and then that time I go to sleep.

Q      And what happened next?

A      And then when I fell asleep I felt something touching my lap.

Q      Touching your lap?

A      Yes.

Q      Did you know what was touching your lap?

A      Yes.

Q      What was touching your lap?

A      Phil.

Q      What did you say?

A      Phil.

Q      Did you say Phil?  Was he using his hand or –

A      His hand.

Q      Could you know which hand?

A      No.

Q      Was anything being said?  How did that make you feel?

A      Sad.

Q      What did you say?

A      Sad.

Q      Okay. Do you feel sad now? Do you want to stop talking about these things? Okay.

*Id.* at 43-47; *see also* Tr. at 5 (Jury Trial, Apr. 5, 2021). M.T.G. also described how she had enjoyed spending time with Lynna and Sablan—including playing with their dogs, going to lunch, and attending church—but that had stopped since the case happened.

[19]    On cross-examination, M.T.G. stated that she liked staying at her Auntie Lynna's house when she originally went there, but "when this case first happened I never liked staying there no more." Tr. at 50 (Jury Trial, Apr. 1, 2021). M.T.G. could not remember how old she was when Sablan touched her; when defense counsel asked, "[W]ere you like four years old?", she replied, "I think so." *Id.* at 51. She was unsure if the time Sablan came out of the shower as she was watching SpongeBob was different than the time that Sablan touched her. When asked if she ever told Lynna, "[T]his didn't happen," she explained, "No. What I meant was like what I told my mom I told her that -- I told Lynna that this happened but what I meant I never told her this yet." *Id.* at 52. Similarly, when asked if she told her Aunt Penina, "[T]his did not happen," she replied, "No. What I meant was like I told my mom that I told her but what really happened I never told Lynna that I told her that this happened." *Id.* at 55. When asked if she told Lynna the story was a lie, she replied, "No. I didn't tell her it was a lie. I told my mom that I told Lynna that this happened, but I never told her yet." *Id.* at 55-56. On redirect, M.T.G. stated that she was currently in third grade, and she thought her second-grade teacher was still her teacher when Sablan touched her "private" over her clothes. *Id.* at 57. This redirect testimony was later struck by the trial court.

[20]    Following the close of the People's case, Sablan moved to strike testimony unrelated to the indicted incident. The People agreed as to M.T.G.'s testimony about the time on the air mattress,

but argued Sablan opened the door to prior incidents when asked about her being four years old, noting that the prosecutor's limited redirect returned her testimony to the indicted towel incident. Defense counsel incorrectly argued he had asked M.T.G. how old she was and that *she* replied, "four years." *Id.* at 64. The People argued M.T.G. was clear that the referenced touching occurred after the towel incident, meaning it was not a prior incident and it could be part of the indicted charges. The court took under advisement the motion to strike and motions to acquit on both charges; the jury remained recessed until Monday, four days later.

[21]     On Friday, April 2, the court granted Sablan's motion and struck any testimony related to any touching incident on a day different from the indicted indecent exposure. The trial court compared the supporting Declaration to the Magistrate's Complaint, the People's theory of the case, and documents exchanged in discovery to conclude a material variance existed—the defendant was led to conclude he was indicted for a single day of crimes, but the evidence pointed otherwise. RA, tab 87 at 2, 11 (Dec. & Order, Aug. 16, 2021). When the trial resumed on April 5, the court explained the breadth of its striking, using timestamps from the record. The court determined "the People's [March 31] questions attempted to elicit testimony about other acts of touching which led to testimony about an alleged touching incident that occurred on a day different from the indecent exposure, the touching incident with Auntie Lynna on the air mattress." Tr. at 5 (Jury Trial, Apr. 5, 2021). The court found the People's direct and redirect on April 1 referred to the same problematic testimony, but defense's cross-examination did not. The court proposed curative instructions, satisfying both parties, and instructed the jury to disregard M.T.G.'s testimony referring to days other than the indicted indecent exposure. The court further ordered

that, "in the event the jury requests playback of testimony in this case, the Court will only play back the portions of the record not stricken."[5] *Id.* at 8.

[22]     The jury found Sablan guilty of Second Degree CSC and not guilty of Indecent Exposure.  Sablan filed a Motion to Acquit and Motion for a New Trial.

[23]     On August 16, 2021, the trial court denied the motion to acquit but granted a new trial.  RA, tab 87 at 1-22 (Dec. & Order).  The trial court stated it was acting "as the 'thirteenth juror' to weigh the evidence and evaluate witnesses' credibility to determine if the evidence 'preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred.'" *Id.* at 9 (quoting *People v. Quinata*, 1999 Guam 6 ¶ 16).  Although the trial court acknowledged that "motions for new trials should be granted 'sparingly and with caution, doing so only in those really "exceptional cases,"'" it emphasized that its "discretion to grant a new trial is much broader than its power to grant a motion for judgment of acquittal," and it "need not view the evidence in the light most favorable to the verdict." *Id.* (quoting *People v. Leslie*, 2011 Guam 23 ¶¶ 15, 25).  The court found that the "delayed striking of M.T.G.'s testimony in this case presents the exceptional circumstance where the subsequent withdrawal of such testimony could not remove the effect caused by its admission." *Id.* at 12 (citing *Throckmorton v. Holt*, 180 U.S. 552, 567-68 (1901); *Holt v. United States*, 94 F.2d 90, 93-94 (10th Cir. 1937)).  The court also granted the motion for new trial on the additional basis that "because of the uncertainties surrounding M.T.G.'s testimony, . . . the evidence in this case 'preponderates sufficiently heavily against the verdict [such] that a serious miscarriage of justice may have occurred.'  Therefore, the interests of justice

---

[5] The court found it notable that "despite how much testimony this instruction was intended to strike, at no point during their deliberation did the jury request a playback of the remaining, permissible testimony."  RA, tab 87 at 15 (Dec. & Order).

require that a new trial be granted." *Id.* at 18 (second alteration in original) (quoting *Leslie*, 2011 Guam 23 ¶ 26).

## II. JURISDICTION

[24] This court has jurisdiction over an appeal from an order granting a new trial. *See* 48 U.S.C.A. § 1424-1(a)(2) (Westlaw through Pub. L. 117-327 (2022)); 7 GCA § 3107 (2005); 8 GCA § 130.20(a)(1) (2005).

## III. STANDARD OF REVIEW

[25] A trial court's decision on a motion for new trial is reviewed for an abuse of discretion. *People v. Messier*, 2014 Guam 34 ¶ 11. Questions of law are reviewed *de novo*. *Id.* Material variance claims are reviewed *de novo*. *People v. Taitano*, 2015 Guam 33 ¶ 9.

[26] Whether evidence falls within the scope of GRE 404(b) is reviewed *de novo*. *People v. Camaddu*, 2015 Guam 2 ¶¶ 9, 47. Evidentiary rulings are reviewed for abuse of discretion. *Id.* ¶ 9.

## IV. ANALYSIS

### A. The People's Reference to a Law Journal Article Does Not Violate the Guam Rules of Appellate Procedure

[27] In their brief, the People cite a journal article to support their argument that young children struggle with the concept of time. Appellant's Br. at 17 (Dec. 30, 2021) (citing John E. B. Myers, *The Child Witness: Techniques for Direct Examination, Cross-Examination, and Impeachment*, 18 Pac. L.J. 801, 827 (1987)). Sablan objects, arguing the article is outside the record on appeal and is the People's attempt to substitute expert testimony where it was denied at trial. Appellee's Br. at 18-19 (Feb. 23, 2022). Sablan is correct that both Guam Rule of Appellate Procedure 7 and 8 GCA § 130.45 limit the record on appeal to documents introduced at trial. However, the People do not present the article as factual evidence to support Sablan's guilt. Instead, the article is offered

alongside case law to bolster the legal argument that child-witness testimony should be specially handled. Appellant's Br. at 17-18. Sablan's reliance on *Cepeda v. Government of Guam*, 2005 Guam 11, is unavailing. There, the appellee tried to introduce knowledge she supposedly held before trial about the factual state of development permits. *Cepeda*, 2005 Guam 11 ¶ 47. However, this court refused to consider evidence not introduced at trial. *Id.* Unlike the appellee in *Cepeda*, here the People offer legal—not factual—guidance for the court.

[28]    To illustrate, it would be appropriate for the People to cite: "Recent studies have undermined traditional notions regarding the unreliability of child witnesses, their untruthfulness, susceptibility to leading questions, or inability to recall prior events accurately." *People v. Jones*, 792 P.2d 643, 655 (Cal. 1990) (in bank). *People v. Jones* relies on and cites the same page of Myers's article to which Sablan objects, and the *Jones* court notes the "difficulty of many children in remembering exact dates" as suggested in the article. *Id.* (citing Myers, *supra*, at 827).

[29]    The People's reference to the article is neither new evidence nor the equivalent of expert testimony; it is appropriate.

## B. The Trial Court Abused its Discretion by Granting a New Trial Based on M.T.G.'s Credibility

[30]    Title 8 GCA § 110.30(a) provides, "The court on motion of a defendant may grant a new trial to him if required in the interests of justice."[6] 8 GCA § 110.30(a) (2005). Our jurisprudence both allows broad discretion and sets a high bar for what qualifies as "interests of justice." *See Messier*, 2014 Guam 34 ¶¶ 12-13.

[31]    In granting a new trial, the trial court does not have to view the evidence favorably to the verdict and in general can "weigh the evidence and evaluate for itself the credibility of the

---

[6] 8 GCA § 110.30(a) is substantively similar to Federal Rule of Criminal Procedure ("FRCP") 33(a), and this court has looked to federal case law interpreting FRCP 33 for guidance. *See Leslie*, 2011 Guam 23 ¶ 15 n.1.

witnesses." *Quinata*, 1999 Guam 6 ¶ 18 (citations omitted). But the statute allows a new trial to be granted only "if required in the interests of justice," 8 GCA § 110.30(a), and, per case law, when evidence "preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred," *Quinata*, 1999 Guam 6 ¶ 16 (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). It is only in an "exceptional case" that "the trial court should interfere with the jury's factual findings." *Leslie*, 2011 Guam 23 ¶ 18. "This power [to grant a new trial against the jury's verdict] obviously should be exercised cautiously and sparingly." *United States v. Hurley*, 281 F. Supp. 443, 449 (D. Conn. 1968).

### 1. The trial court relied on an incomplete standard in granting a new trial

[32]    In granting a new trial under 8 GCA § 110.30(a), the trial court correctly began its analysis of the standard by applying case law that expounds the statute's application. *See* RA, tab 87 at 9 (Dec. & Order) (citing standards from *Quinata*, 1999 Guam 6, and *Leslie*, 2011 Guam 23). *People v. Quinata* provides structure for applying 8 GCA § 110.30(a) in *denying* a motion for a new trial, though it is only partially instructive when the court *grants* a new trial. *See generally Quinata*, 1999 Guam 6. Similarly, *People v. Leslie* dealt with the denial of a defendant's motion for a new trial. *See generally Leslie*, 2011 Guam 23. However, in this analysis the trial court omitted *People v. Messier*, which involved the *grant* of a new trial. *See Messier*, 2014 Guam 34 ¶ 18 (explaining some courts impose stricter appellate review on *grants* of new trials "because of the inherent conflict between 'usual deference to the trial judge [and] deference to the jury on questions of fact'" (alteration in original)). *Messier* is also factually similar to this case and builds upon the application of 8 GCA § 110.30(a) in earlier cases.

[33]    It is necessary to consider *Messier* when determining whether a new trial should be granted because it synthesizes the preceding cases cited by the trial court and explains Guam's test for

"exceptional circumstances" warranting a new trial. It also sets precedent for the grant of a new trial based on the weight of the evidence and credibility determinations, *id.* ¶¶ 12-21—a rationale the trial court relied on, *see* RA, tab 87 at 16-18 (Dec. & Order). *Messier* held that Guam's standard would bar a trial court from granting "a new trial based solely on its disagreement with the jury's credibility determinations, unless credibility issues arise to . . . 'exceptional circumstances' . . . including testimony that is 'patently incredible or defies physical realities.'" *Id.* ¶ 21 (quoting *United States v. Cote*, 544 F.3d 88, 101 (2d Cir. 2008)). In *Messier*, "[w]e [were] persuaded that the jury's traditional and vital role as fact-finder should be protected and trial courts should not serve as 'thirteenth jurors.'" *Id.* Yet here, the trial court did just that. *See* RA, tab 87 at 9 (Dec. & Order) ("In deciding on a motion for a new trial, the Court acts as the 'thirteenth juror' to weigh the evidence and evaluate the witnesses' credibility . . . ."). By ending its analysis at *Leslie* and omitting *Messier*, the trial court applied the incorrect standard for granting a new trial.

### 2. The correct new trial standard is higher than the trial court recognized

[34]    The cases in which a new trial was warranted based on "exceptional circumstances" surrounding witness credibility all involve some practical impossibility with the testimony. None have hinged on flawed child testimony, given that a child's recall of time and chronology is subject to confusing retelling. *See People v. Campbell*, 2006 Guam 14 ¶¶ 27-30 ("[I]n the interests of justice and recognizing that young children cannot be expected to be exact regarding times and dates, a child's uncertainty as to time or date upon which the offense charged was committed goes to the weight rather than the admissibility of the evidence." (quoting *State v. Wood*, 319 S.E.2d 247, 249 (N.C. 1984))).

**[35]**    *Leslie* and *Messier* relied in part on *United States v. Simms*, 508 F. Supp. 1188 (W.D. La. 1980), wherein a new trial was granted under Federal Rule of Criminal Procedure ("FRCP") 33. In *Simms*, the defendant was charged with a vote-buying conspiracy. 508 F. Supp. at 1192. However, the evidence lacked direct proof that the defendant intentionally entered into the conspiracy—an essential element required to be proved beyond a reasonable doubt. *Id.* at 1203-04. Instead, the prosecution relied on "inferences upon inferences drawn from uncorroborated testimony that, upon careful scrutiny, [were] subject to questions of credibility." *Id.* at 1207.

**[36]**    These cases were also informed by *United States v. Capati*, 980 F. Supp. 1114 (S.D. Cal. 1997). *See Leslie*, 2011 Guam 23 ¶ 26; *Messier*, 2014 Guam 34 ¶¶ 29-36. In *Capati*, the defendant was charged with conspiring to interfere with commerce by robbery. 980 F. Supp. at 1117. However, it was found that an essential meeting—critical to establishing defendant's guilt—could not have occurred based on extensive documentary evidence he was out of state. *Id.* at 1133. Also, the supposed conspiracy was established only by supremely suspect testimony, as the co-conspirator was offered immunity and the most important part of his testimony was demonstrably false. *Id.* at 1133-34.

**[37]**    *United States v. Hurley*, 281 F. Supp. 443 (D. Conn. 1968), also explicated our high standard for "exceptional circumstances." In *Hurley*, the essential testimony about conspiracy in insurance fraud fell apart when the co-defendant, who orchestrated the scheme, provided significantly inconsistent accounts to the FBI and at one point called his own words "all lies." 281 F. Supp. at 449. The FBI agent's records were impossible to square with dates, and the defendant provided "incontrovertible documentary evidence [including telephone records that contradicted the agent's claims] which supported his testimony to a large degree." *Id.* at 450. The court determined a new trial should be granted only "where justice dictates that a verdict should not

stand," *id.* at 449, and we agreed, *see Messier*, 2014 Guam 34 ¶¶ 33-34 (explaining that *Leslie* did not "establish a low standard" and that any witness impeachment worthy of a new trial must be substantial, unrehabilitated, and uncorroborated, and "any 'uncertainties or discrepancies' must relate to a central issue in dispute and must vary to a significant degree").

### 3. Without considering *Messier*, the trial court incorrectly considered itself a "thirteenth juror" and abused its discretion in granting a new trial

[38]    When comparing M.T.G.'s credibility against the verdict, the trial court analyzed only the unstricken testimony it found "permissible." RA, tab 87 at 16-18 (Dec. & Order). We do the same to determine whether the trial court abused its discretion in applying the law to these facts. In its order granting a new trial, the court—acting as a "thirteenth juror"—found M.T.G.'s testimony to have "significant uncertainty" because it did not specify timing or which touching allegation was being described. *Id.* at 16-17. The court found the "evidence in this case 'preponderates sufficiently heavily against the verdict [such] that a serious miscarriage of justice may have occurred.'" *Id.* at 18. Applying *Messier*, we find these circumstances are not exceptional to the degree required for granting a new trial under 8 GCA § 110.30(a).

[39]    After striking, M.T.G.'s remaining testimony included saying "yes, he did" touch "in my private," referring to Sablan, and her having pointed to her crotch or upper thighs. Tr. at 61-62 (Jury Trial, Mar. 31, 2021). We find this testimony sufficiently credible to avoid a new trial.

[40]    Unlike in *Hurley*, here, there was no documentary evidence contradicting M.T.G.'s account of the CSC, and none of M.T.G.'s testimony relied on an impossible event. *Cf. Hurley*, 281 F. Supp. at 450-51 ("incontrovertible documentary evidence," including telephone records and office memos existed which supported defendant's testimony and contradicted witness's testimony); *see also Capati*, 980 F. Supp. at 1133-34; *Messier*, 2014 Guam 34 ¶ 31 ("Nothing in the evidence establishes the falsehood of either the victim or the eyewitness's testimony regarding the

commission of the alleged criminal sexual conduct."). M.T.G. did not recant or admit to lying about the abuse. *Cf. Hurley*, 281 F. Supp. at 449 (co-defendant labeled his statement to FBI as "all lies"). When questioned, M.T.G. seemed to clarify that she lied to her mother about having already disclosed the abuse to Lynna, but she testified she did not lie *about* the abuse. Tr. at 52, 55-56 (Jury Trial, Apr. 1, 2021); *see also Messier*, 2014 Guam 34 ¶ 36 (finding trial court abused its discretion by relying on impeachments of witnesses using previous false allegations to discredit current testimony). At most, M.T.G.'s inconsistencies relate to time or setting, but unlike those cases that relied on a necessary conspiratorial event, here, time is not an essential element. *Campbell*, 2006 Guam 14 ¶ 27.

[41] The evidence here is also dissimilar to that in *Capati*. M.T.G. had no obvious motive to lie and may have sacrificed close family relationships by reporting. *Cf. Capati*, 980 F. Supp. at 1133-34 (government's key witness fabricated crucial testimony to obtain grant of federal immunity). In contrast, the witnesses who testified that M.T.G. recanted to them—Lynna and Penina—provided vague and contradictory testimony, have a close relationship with Sablan, and may rely on his income to care for their bedridden brother. Tr. at 37-38, 40 (Jury Trial, Apr. 5, 2021).

[42] Further, *Simms* does not implicate the same witness-credibility test we employed in *Messier*, and it is not analogous to this case regarding exceptional circumstances. M.T.G. provided direct, first-hand testimony of the charged crime. Her statements to other witnesses, shown by their testimony, supported the same account. *See* Tr. at 39 (Jury Trial, Mar. 30, 2021); Tr. at 36 (Jury Trial, Mar. 31, 2021). Unlike in *Simms*, evidence of Sablan's guilt was not merely inferred to be criminal from "equally reasonable innocent explanations" that lacked direct testimony about

him touching M.T.G.'s genital area. *See Messier*, 2014 Guam 34 ¶ 29 (citing *Simms*, 508 F. Supp. at 1204, 1207).

**[43]** In *Messier*, we found the trial court abused its discretion in part by acting as a "thirteenth juror" as to witness credibility and by not accounting for reasonable inconsistencies in the minor witnesses' testimony. *Id.* ¶ 36. Here, the trial court committed the same errors by not incorporating *Messier* into its analysis. The trial court thus improperly granted a new trial based on its own opinion that the evidence was too uncertain to convict. Granting a new trial based on witness credibility under 8 GCA § 110.30(a) requires the crucial testimony from the witness to raise such confusion to suggest the impossibility of the event testified to. *See Messier*, 2014 Guam 34 ¶¶ 31, 36. That is not what happened here. Though at times imprecise, the imprecisions of M.T.G.'s testimony did not rise to the level of suggesting the impossibility of the occurrence. The trial court abused its discretion in granting a new trial on witness-credibility grounds.

**[44]** The trial court also found "exceptional circumstances" existed because striking may not have sufficiently cured M.T.G.'s "impermissible" testimony. RA, tab 87 at 15-16 (Dec. & Order). The trial court explained its doubt as to the success of striking M.T.G.'s specific statements and instructing the jury to consider only a single day of allegations; the statements were muddled within voluminous and complex testimony and sat in the jury's mind for multiple days. *Id.* The court concluded that if M.T.G.'s unstricken testimony erroneously influenced the jury, then uncertainty would surround the verdict. *Id.* at 16. However, we are not persuaded this possible procedural flaw qualifies as "exceptional circumstances" calling for the drastic solution of a new trial under 8 GCA § 110.30(a), and we now turn to why the success of the court's striking is not dispositive to the need for a new trial.

**C. No Material Variance Between the Indictment and M.T.G.'s Testimony Occurred that Warranted Striking the Testimony or Granting a New Trial**

[45]	The grant of a new trial was rooted in the decision that a material variance existed, and the trial court struck significant parts of M.T.G.'s testimony on that basis. *See* RA, tab 87 at 2-3, 10-11 (Dec. & Order). This court has stated that in CSC cases, the issues of material variance and the admissibility of evidence (and the scope of its use) are "inextricably linked." *Taitano*, 2015 Guam 33 ¶ 28. Still, this court analyzes these issues separately. *See id.* As discussed below, the Constitution did not justify the trial court's decision to strike significant parts of M.T.G.'s testimony or grant a new trial.

### 1. The trial court erred in striking M.T.G.'s testimony because there was no material variance between her testimony and the indictment

[46]	"[M]aterial variance refers to a discrepancy between the proof at trial and the wording of the indictment." *Id.* ¶ 19. Stemming from a criminal defendant's Fifth Amendment rights to "fair notice of what he is accused of, and not to be twice put in jeopardy on the accusation," *id.* ¶ 18 (quoting *Campbell*, 2006 Guam 14 ¶ 12), as a general rule, "allegations and proof must correspond," *id.* (quoting *United States v. Tsinhnahijinnie*, 112 F.3d 988, 992 (9th Cir. 1997)). Evidentiary rulings which infringe on constitutional rights are reviewed *de novo*. *People v. Diego*, 2013 Guam 15 ¶ 8.

[47]	*People v. Taitano* established that "[a]nalysis of a material variance claim consists of two separate but related inquiries." 2015 Guam 33 ¶ 11.

> First, "[t]o the extent that the variance concerns a lack of proof at trial regarding the essential elements of an indictment, it functions as an attack on the sufficiency of evidence supporting a conviction." Second, "a claim of variance [may] also function[] as a challenge based on the deprivation of due process rights," such as the right to receive "proper notice of charges and [the] protection against double jeopardy."

*People v. Taisacan*, 2018 Guam 23 ¶ 16 (alterations in original) (quoting *Taitano*, 2015 Guam 33 ¶ 11).

[48]     Here, we conclude there is sufficient "evidence in the record [that] could have led a reasonable jury to find all material elements of the indictment satisfied beyond a reasonable doubt." *Taitano*, 2015 Guam 33 ¶ 17.  In denying Sablan's motion to acquit, the trial court drew every reasonable inference in favor of the prosecution.  RA, tab 87 at 6 (Dec. & Order) (citing *People v. Anastacio*, 2010 Guam 18 ¶ 17).  In making the first *Taitano* inquiry, we also "review the evidence in the light most favorable to the People . . . ." *Taisacan*, 2018 Guam 23 ¶ 17 (quoting *Diego*, 2013 Guam 15 ¶ 30).  The trial court found there was sufficient evidence to support the CSC guilty verdict because witness testimony supported the inference that Sablan caused his hand to touch the primary genital area of 8-year-old M.T.G. before the return of the indictment and within the statute of limitations.  RA, tab 87 at 7-8 (Dec. & Order).  We find no error in this conclusion.  *See Taisacan*, 2018 Guam 23 ¶ 17 ("We are 'concerned with the existence or nonexistence of evidence, not its weight.'  '[I]f there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find the case was properly submitted to the jury.'" (alteration in original) (quoting *People v. Song*, 2012 Guam 21 ¶ 29)).  However, "this conclusion is not dispositive, since mere sufficiency of evidence does not end the court's inquiry in a material variance context." *Taitano*, 2015 Guam 33 ¶ 17.

[49]     The second *Taitano* inquiry asks whether the variance between the allegations and the proof offered at trial affected the accused's substantial rights "by either: (1) taking them by surprise and hindering their ability to present a defense, or (2) exposing them to the risk of another prosecution for the same offense." *Id.* ¶ 18 (citing *Campbell*, 2006 Guam 14 ¶ 12; *Berger v. United States*, 295 U.S. 78, 82 (1935)).  There will be no Fifth Amendment violation "[w]here the variance

is not 'material' and does not 'affect the substantial rights' of the accused." *Taisacan*, 2018 Guam 23 ¶ 29 (quoting *People v. Diaz*, 2007 Guam 3 ¶ 39). This court begins its analysis by determining whether a variance occurred. *Id.*

[50]    The trial court determined that a variance occurred because "the Indictment and charges against [Sablan] referred to a single incident wherein the People alleged that two different crimes were committed," RA, tab 87 at 11 (Dec. & Order), but large parts of M.T.G.'s testimony related to "incidents of alleged touching that occurred at a time different from the Indecent Exposure incident," *id.* at 10. From the bench, the trial court cited this material variance as the basis for striking M.T.G.'s testimony because it caused unfair surprise to Sablan. *See id.* at 2-3, 11. The court found that Sablan was not prepared to defend against an accusation alleged to have occurred on a separate day from the indecent exposure. *Id.* at 2-3. The court also ruled that "if it allowed testimony concerning an allegation of touching that occurred on a day or time different from the alleged Indecent Exposure to be considered as evidence of the CSC charge, then if convicted of the CSC charge, it would not be clear which incident formed the basis of Defendant's conviction." *Id.* at 11. The trial court relied on *Taitano* to conclude that such uncertainty would expose the defendant to double jeopardy. *Id.*

[51]    First, M.T.G.'s testimony about prior touching that strayed from the trial court's strict construction of the indictment is "not a true variance." *See Taisacan*, 2018 Guam 23 ¶ 30. We have held that a variance requires presentation of evidence at trial that directly conflicts with the facts alleged. *Id.* As discussed below, although perhaps objectionable on other grounds, evidence of prior acts like those alleged in an indictment does not present such a direct conflict. *See, e.g.*, *United States v. McBride*, 676 F.3d 385, 397 (4th Cir. 2012) (noting that difference between admissibility and inadmissibility is "linkage" between prior-act evidence and crimes charged in

indictment). Furthermore, time is not considered an essential element of criminal sexual conduct. *Taitano*, 2015 Guam 33 ¶¶ 15-16; *Campbell*, 2006 Guam 14 ¶ 27. Where time is not an essential element, "[p]roof of any date before the return of the indictment and within the statute of limitations is sufficient." *Taitano*, 2015 Guam 33 ¶ 16 (alteration in original) (quoting *Diaz*, 2007 Guam 3 ¶ 40). Any "variance" between M.T.G.'s testimony about the timing of the touching and the indicted dates was not material. *See Taisacan*, 2018 Guam 23 ¶ 18.

[52] In reviewing both the fair notice and double jeopardy concerns *de novo*, we find no material variance exists. *See Taitano*, 2015 Guam 33 ¶ 9. Though, much like the result we reached in *Taisacan*, even if there was a variance, Sablan had sufficient notice of the facts that would be presented. *See Taisacan*, 2018 Guam 23 ¶ 31.

> When a criminal defendant alleges a material variance, a court determining whether the defendant had proper notice of the charges against him or her "may look to sources other than the indictment for evidence of adequate notice, including 'a complaint, an arrest warrant, or a bill of particulars,' as well as information provided 'during the course of a preliminary hearing.'"

*Id.* ¶ 31 (quoting *Taitano*, 2015 Guam 33 ¶ 19).

[53] Sablan was provided with the Santos report in discovery, which discusses M.T.G.'s report of multiple instances of touching, so he cannot claim to be surprised that she testified in conformity with past reports. Sablan had adequate notice of the charges against him, and although notice of prior-act evidence was largely informal, Sablan was not misled to believe the government would restrict any information in Santos's report to narrow, pre-decided, non-propensity purposes. Sablan has identified no way in which he was prejudiced by this alleged variance.

[54] In *Taitano*, we found the variance from the indictment materially impermissible because it concretely affected Taitano's defense, which focused heavily on the location of the incident. 2015 Guam 33 ¶¶ 18-23. Sablan has not shown that M.T.G.'s stricken statements affected his defense

that he did not commit CSC. Unlike the defendant in *Taitano*, Sablan has not provided "concrete examples of how his defense would have differed to refute allegations" that the abuse was not an isolated incident. *See Taisacan*, 2018 Guam 23 ¶ 32 (quoting *Taitano*, 2015 Guam 33 ¶ 22).

[55]     Furthermore, this is not a case like *Taitano*, wherein the facts presented at trial relate to a separate incident for which the People did not obtain an indictment. *See id.* ¶ 31; *Taitano*, 2015 Guam 33 ¶ 21. In *Taitano*, the defendant was initially charged with three counts of Second Degree CSC. 2015 Guam 33 ¶ 3. The first charge alleged an assault occurred in Yigo between 2008 and 2009, the second in Mangilao in 2010, and the third at NCS Dededo in 2011. *Id.* The grand jury returned an indictment for only the Mangilao assault in 2010. *Id.* However, the victim testified regarding only the unindicted Yigo assault, stating that "nothing" happened in Mangilao. *Id.* ¶ 5. Taitano was convicted, and we granted a new trial, in part, because there was a "significant risk of double jeopardy as a result of the ambiguous verdict." *Id.* ¶ 23. We emphasized that it was unclear which of the remaining unindicted allegations in the initial complaint were barred from prosecution:

> [T]he People could potentially bring an identical indictment against Taitano for the incident in Mangilao, claiming that the present conviction covered the incident in Yigo. Alternately, it is unclear if the existing conviction would preclude the People from bringing Taitano to trial under the theory that the Yigo incident had occurred in 2009, using their own trial memorandum to claim that the present case dealt with the 2010 incident in Mangilao.

*Id.* ¶ 23 (internal citations omitted).

[56]     We do not find a significant risk of double jeopardy here. We stated in *Taitano*:

> [T]he introduction of testimony regarding unindicted sexual abuse allegations without any instruction as to the purpose of such evidence was extremely prejudicial and risked confusion of the issues, as it created a significant likelihood that Taitano was convicted on evidence of an incident other than the one for which he was charged.

*Id.* ¶ 35. Here, the trial court instructed the jury that it was to consider only allegations of touching that occurred on the day of the alleged indecent exposure. RA, tab 87 at 10 (Dec. & Order). In their closing argument, the People elected the act that was the basis of the indictment by telling the jury:

> Remember, we have to read these things in connection with the other charge, okay? At one point, he was playing with his [penis] in front of her . . . . She testified regarding being [sic] sexual contact -- did he touch her? Yes, in my private. That's what she said. And then she gestured. . . . [T]here's only two charges here. Here's the second charge [indecent exposure]. It has the same thing. The date – it's the same date.

Tr. at 11 (Jury Trial, Apr. 6, 2021).

[57] Unlike in *Taitano*, the likelihood that Sablan was convicted on evidence of an incident other than the one for which he was charged is not substantial. So any variance between the indictment and the testimony offered during trial was immaterial and "did not rise to the level of a constitutional violation." *Taisacan*, 2018 Guam 23 ¶ 32. The trial court erred in striking the testimony of M.T.G. based on a material variance.

### 2. The trial court abused its discretion in granting a new trial based on material variance

[58] Although the grant of a new trial is reviewed for an abuse of discretion, *Messier*, 2014 Guam 34 ¶ 11, a court abuses its discretion when it bases its decision on an incorrect view of the law, *Cruz v. Cruz*, 2022 Guam 7 ¶ 18 ("A trial court abuses its discretion when its decision is based on an erroneous conclusion of law . . . ."). *But see United States v. McClatchey*, 217 F.3d 823, 831 (10th Cir. 2000) ("Whether a variance between an indictment and the case presented at trial is sufficiently prejudicial to warrant a new trial is a question of law. This court therefore reviews *de novo* the district court's decision to grant a new trial on the basis of a prejudicial variance." (internal citations omitted)).

**[59]**    In its order, the trial court discussed its conclusion that there was a material variance between M.T.G.'s testimony and the indictment but did not explicitly condition the grant of the new trial on this variance. *See* RA, tab 87 at 16 (Dec. & Order) (relying on *Throckmorton*, 180 U.S. at 567, to conclude that "the withdrawal of the testimony did not cure the effect caused by its admission, thereby warranting the granting of a new trial"). However, the central holding of *Taitano* is that a material variance warrants a new trial. 2015 Guam 33 ¶ 26. Also, both parties argue under the assumption that material variance was a basis for the grant of a new trial. Appellant's Br. at 15; Appellee's Br. at 4. We find no variance between M.T.G.'s testimony and the indictment. Also, the alleged variance is neither material nor affects Sablan's substantial rights. To the extent the grant of a new trial was based on the trial court's conclusion that a material variance occurred, we reverse that decision for an abuse of discretion as it was based on an erroneous conclusion of law.

**[60]**    The trial court also found it "difficult . . . to conclude that the jury was able to accurately recall, after the passing of several days, which testimony they were allowed to consider . . . ." RA, tab 87 at 15-16 (Dec. & Order). It decided this case presented the exception where "the withdrawal of the testimony did not cure the effect caused by its admission." *Id.* at 16. However, this decision was also based upon an erroneous conclusion of law because the testimony should not have been stricken as a material variance. *Cf Snyder v. Freight, Constr., Gen. Drivers, Warehousemen & Helpers, Loc. No. 287*, 175 F.3d 680, 686 (9th Cir. 1999), *amended*, (9th Cir. June 3, 1999) (reversing order for new trial and reinstating jury verdict because "the district court's new trial order was based on an erroneous legal theory"). It was an abuse of discretion to grant a new trial on the basis that the curative instruction was not sufficient.

[61]     We find the trial court incorrectly applied the law and erroneously assessed the facts to conclude a material variance existed, and it abused its discretion in granting a new trial on this basis.

**D.  M.G.T.'s Testimony Was Admissible Under the GRE**

[62]     It is unclear whether the jury incorporated M.T.G.'s stricken statements into its verdict.  As the testimony was not stricken for four days, the trial court found that "the instant case presents an example where the Court seriously doubts whether it is possible for the jury to efface, or erase, the stricken testimony from their minds."  RA, tab 87 at 13 (Dec. & Order).  The trial court based this conclusion on the fact that "the testimony ordered to be stricken was voluminous and complex, remained before the jury for several days . . . the stricken testimony was highly prejudicial . . . and the competent evidence remaining was far from conclusive."  *Id.*  This reasoning led the trial court to conclude that the testimony was ineffectively stricken.  *Id.* at 13-16.  During both the hearing for a new trial and in their brief, the People argue the jury showed its understanding of the court's instructions in part by acquitting Sablan on one charge.  *See* Tr. at 19 (Mot. Hr'g, May 17, 2021); Appellant's Reply Br. at 13 (Mar. 9, 2022) ("[T]he jury was detailed and exacting in their deliberations as evidenced by the return of a not guilty verdict on one of the two charges.").  The People also argue it is improper for Sablan to have declared he was "satisfied" with the curative instructions and then on appeal argue the instructions were insufficient.  Appellant's Br. at 29; Reply Br. at 12.

[63]     Here, the evidence includes only what the jury heard.  M.T.G.'s testimony regarding what was included in Santos's report does not impact whether the jury was prejudiced as they did not hear this testimony.  Tr. at 66-68 (Jury Trial, Mar. 31, 2021) (dismissing the jury).  The risk here is only any prejudice caused by the incorporation of the stricken statements.

**[64]** Aside from asking, "How many times did he touch you?", the People neither accused Sablan of multiple CSC offenses nor alluded to a history of abuse. Instead, the People maintain the testimony was not about a prior act, but rather is admissible under GRE 404(b). Appellant's Br. at 21, 26. During trial, the only reference, outside of the stricken testimony, to a possible previous date of abuse related to M.T.G. being four years old. *See* Tr. at 51 (Jury Trial, Apr. 1, 2021). Though, this is outside the dates for the indicted charges.

**[65]** We reserve judgment on whether M.T.G.'s stricken statements constitute GRE 404(b) evidence by describing a past act, which the parties dispute and the record does not firmly establish. We instead hold that *if* the testimony was GRE 404(b) evidence, it could have been admissible.[7]

**[66]** Sourced from the corresponding persuasive federal rule, GRE 404 generally prohibits character evidence to prove propensity. However, under subsection (b), evidence of "prior bad acts"[8] for non-character purposes is allowed:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Guam R. Evid. 404(b); *see also United States v. Scarfo*, 850 F.2d 1015, 1019 (3d Cir. 1988) (emphasizing that listed admissible purposes are not the only proper ones).

---

[7] In addition, for the purposes of this opinion, we shall assume that GRE 413 is inapplicable. Though it perhaps could have been implicated, as it covers "evidence of the defendant's commission of another offense or offenses of criminal sexual conduct," Guam R. Evid. 413, neither the parties nor the trial court considered the possible application of the rule in this case. As "we are a court of review, not of first view," we decline to make an evidentiary characterization lacking a basis in the record below or in the briefings submitted to this court. *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005); *see also Taitano*, 2015 Guam 33 ¶ 36 (declining to consider applicability of GRE 413 when it was raised only in a party's reply brief).

[8] Although not quoted from the statutes, courts routinely use the phrase "prior bad acts" to describe evidence offered under Federal Rule of Evidence ("FRE") 404(b) and GRE 404(b). *See Huddleston v. United States*, 485 U.S. 681, 684 (1988); *People v. Torres*, 2014 Guam 8 ¶ 18. But the act itself need not be "bad" to qualify. *See United States v. Scott*, 677 F.3d 72, 78 n.5 (2d Cir. 2012) (collecting cases).

[67] We review *de novo* whether evidence falls within the scope of GRE 404(b). *Camaddu*, 2015 Guam 2 ¶ 9. We review admission of evidence for abuse of discretion under GRE 404(b) and GRE 403. *See id.* To err on the side of caution, we consider whether M.T.G.'s testimony *could* have described a prior act and analyze accordingly.

### 1. If M.T.G.'s testimony is "prior-act" evidence, the content was admissible under GRE 404(b)

[68] "Rule 404(b) is a rule of inclusion," *United States v. Lague*, 971 F.3d 1032, 1040 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1695 (2021) (citation omitted), in which "[e]vidence of other crimes or acts is admissible . . . 'except where it tends to prove *only* criminal disposition,'" *United States v. Ayers*, 924 F.2d 1468, 1473 (9th Cir. 1991) (citation omitted).

[69] To determine whether the content of evidence is admissible, Guam applies the four-part test laid out in *United States v. Hinton*, 31 F.3d 817, 822 (9th Cir. 1994). *People v. John*, 2016 Guam 41 ¶ 17. "Evidence of a prior bad act is admissible under GRE 404(b) when the People establish 'that the evidence (1) proves a material element of the crime currently charged; (2) is similar to the charged conduct; (3) is based on sufficient evidence; and (4) is not too remote in time." *Id.* (quoting *Camaddu*, 2015 Guam 2 ¶¶ 12, 47). Relevant here, the *Hinton* test is used where GRE 404(b) notice is contested and where the trial court may not have properly examined GRE 403. *See People v. Palisoc*, 2002 Guam 9 ¶ 8; *John*, 2016 Guam 41 ¶ 22. We find that M.T.G.'s stricken testimony meets all four elements.

### a. The past conduct is probative of the material element of sexual contact

[70] To be admissible, the first *Hinton* element requires GRE 404(b) evidence to be probative of a material element of the charged crime. *Palisoc*, 2002 Guam 9 ¶ 8 (citing *Hinton*, 31 F.3d at 822).

[71]     Sablan was indicted for Second Degree CSC in violation of 9 GCA § 25.20(a)(1) and (b), requiring "the following relevant elements [to] be met: (1) the person engages in sexual contact with another, and (2) the other person is under fourteen (14) years of age." *Campbell*, 2006 Guam 14 ¶ 37.  As M.T.G.'s age is not in question, the issue is whether M.T.G.'s stricken testimony was probative of the fact that Sablan engaged in sexual contact with her.

[72]     To establish Second Degree CSC, the People needed to prove that sexual contact occurred, defined as "the intentional touching of the victim's or actor's intimate parts . . . if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification."  9 GCA § 25.10(a)(8) (2005).[9]  We have found this *Hinton* element satisfied where past sexual contact with the same victim is probative to establish a pattern that meets multiple GRE 404(b) paths to admission, such as lack of mistake, opportunity, motive, or to support the general prosecution theory of the defendant's abusive relationship with the victim.  *See Taitano*, 2015 Guam 33 ¶ 31; *People v. Torres*, 2014 Guam 8 ¶ 42.

[73]     In the unstricken testimony, offered on March 31, 2021, M.T.G. stated Sablan touched her in her "private," and she pointed to her upper thigh area.  Tr. at 61-62 (Jury Trial, Mar. 31, 2021).  She was then asked how many times he touched her there.  *Id.* at 62.  Though later stricken, she testified she was "sleeping" and "felt something."  *Id.*  Later, she testified again that Sablan touched her on her "private," that Sablan's hand touched her lap, and that he touched her over her clothes when she may have been in second grade.  Tr. at 43, 46-47, 57 (Jury Trial, Apr. 1, 2021).  This was also stricken.

[74]     The stricken part seems to describe sexual contact, and the record lacks any medical or hygiene reason Sablan would touch the primary genital area of eight-year-old M.T.G.  Thus,

---

[9] The definition of "sexual contact" is now found in 9 GCA § 25.10(a)(9) per amendments made in Guam Public Law 36-101:2 (June 15, 2022).

M.T.G.'s testimony of Sablan's past intentional touching is probative as to whether the charged

touching was intentional and for sexual gratification. The prior intentional sexual contact helps to

establish a pattern that refutes an accidental or mistaken touching during the April incident. *See

Taitano*, 2015 Guam 33 ¶ 31. Further, in its order, the trial court notes that a defendant's conduct

preceding the crime can prove intent. RA, tab 87 at 8 (Dec. & Order) (citing *Anastacio*, 2010

Guam 18 ¶ 33).

[75]     M.T.G.'s stricken testimony is sufficiently probative of Sablan's intent, and this *Hinton*

element is satisfied.[10]

### b.   The past and charged conduct are sufficiently similar

[76]     The second *Hinton* element requires there be "sufficient[] similar[ity]" between the past

conduct and the conduct charged. *John*, 2016 Guam 41 ¶ 24. The indictment charges that Sablan

"did intentionally engage in sexual contact with another, to wit: by causing [his] hand to touch the

primary genital area of M.T.G." RA, tab 72 at 1 (Am. Indictment).

[77]     M.T.G.'s statement, "When I was sleeping with my Auntie Lynna and then I felt something

on my - -" was stricken. Tr. at 5 (Jury Trial, Apr. 5, 2021). In context, this testimony describes

Sablan touching in or near M.T.G.'s primary genital area. It is sufficiently similar to the Second

Degree CSC charge, as it describes Sablan using his hand to touch in or near M.T.G.'s genital

area. As the testimony is sufficiently similar to the charge in the indictment, this *Hinton* element

is met.

### c.   The GRE 404(b) evidence is based on sufficient evidence

[78]     "The third prong that must be satisfied for admissibility under Rule 404(b) is sufficiency

of the evidence." *Palisoc*, 2002 Guam 9 ¶ 25. M.T.G. testified to what she experienced; we have

---

[10] The GRE 404(b) probative analysis under this *Hinton* factor impacts the GRE 403 analysis below.

found such evidence satisfies this *Hinton* element. *See, e.g.*, *Camaddu*, 2015 Guam 2 ¶ 52; *Torres*, 2014 Guam 8 ¶ 44 ("The focus is on whether the prosecution can show that a jury could reasonably conclude both that the [act] occurred and that [the defendant committed it]." (alterations in original) (quoting *Palisoc*, 2002 Guam 9 ¶ 26)); *see also Hinton*, 31 F.3d at 823 (noting that testimony of one witness, even if uncorroborated, is sufficient evidence to satisfy test).

### d. The prior act is not too remote in time

[79]    Finally, the fourth prong looks at the gap in time between the prior bad act and the crime charged. *Palisoc*, 2002 Guam 9 ¶ 27. This court rejects a rigid date rule for this element. *Id.*; *cf. United States v. Johnson*, 132 F.3d 1279, 1283 (9th Cir. 1997) (allowing thirteen-year gap where evidence was extremely probative and relevant). This court has found that a gap of ten years was not too remote in time. *See Camaddu*, 2015 Guam 2 ¶ 53.

[80]    The assumed period between the prior bad act mentioned in M.T.G.'s stricken testimony and the present charges is four years. *See* Appellee's Br. at 7 (calculating four years old as "four years too early" for indicted incident). Even assuming M.T.G. has the timing wrong, that incident would fall within a not-too-remote timeframe because it is inherently less than ten years before and very similar to the charged crime of touching M.T.G.'s genital area.

[81]    Thus, all *Hinton* elements are met, and the court could have admitted the content of M.T.G.'s stricken testimony under GRE 404(b).

### 2. The government did not clearly violate the GRE 404(b) notice requirement

[82]    When requested, GRE 404(b) requires "the prosecution in a criminal case [to] provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." Guam R. Evid. 404(b). The People's apparent lack of intent to use prior act evidence complicates this

statutory-notice-requirement analysis. So, in the present case, we analyze notice regardless of intent, though we caution the People to conduct a thorough GRE 404(b) analysis before trial to avoid "the needless complications" of forcing a trial court to quickly assess admissibility without the advantages of context and time that appellate courts have. *See United States v. Varoudakis*, 233 F.3d 113, 124-25 (1st Cir. 2000).

[83] In 1991,[11] pretrial notice was added to Federal Rule of Evidence ("FRE") 404(b) to "reduce surprise and promote early resolution on the issue of admissibility." Fed. R. Evid. 404(b) advisory committee's note to 1991 amendment. The amendment was "intended to reduce surprise . . . . [and placed] Rule 404(b) in the mainstream with notice and disclosure provisions in other rules of evidence." *United States v. Barnes*, 49 F.3d 1144, 1147 (6th Cir. 1995) (quoting Fed. R. Evid. 404(b) advisory committee's note to 1991 amendment). Originally, the Rule purposely did not specify the format or timing for notice, as determining what constituted a reasonable disclosure depended largely on the circumstances. *United States v. Giampa*, 904 F. Supp. 235, 283 (D.N.J. 1995).

[84] This "reasonableness" determination is within the court's discretion and should typically be determined within the context of trial. *See id.*; *United States v. McNeil*, No. 3:09cr320, 2010 WL 56096, at *6 (M.D. Pa. Jan. 5, 2010). The government must disclose Rule 404(b) evidence before use, even if it is unsure how it intends to use such evidence—otherwise, the evidence is inadmissible. *See United States v. Vega*, 188 F.3d 1150, 1154-55 (9th Cir. 1999) (faulting government for not disclosing potential 404(b) evidence that eventually came in through rebuttal witnesses); *United States v. Mosquera*, 886 F.3d 1032, 1045 (11th Cir. 2018) ("[T]he admission

---

[11] In 2020, FRE 404(b) was updated to include more stringent procedures for giving notice to defendants. *See* Fed. R. Evid. 404(b) advisory committee's note to 2020 amendment. The update requires notice in writing regardless of defendant's request and articulation of a non-propensity purpose. Fed. R. Evid. 404(b)(3).

of extrinsic act evidence requires 'the prosecution to provide notice of its intended use to the defense, regardless of how it intends to use the extrinsic act evidence at trial . . . .'" (quoting *United States v. Bradley*, 644 F.3d 1213, 1273 (11th Cir. 2011))). Some states and the recently amended FRE 404(b) require notice to be in writing; Guam does not. *Compare* Fed. R. Evid. 404(b)(3)(c), *with* Guam R. Evid. 404(b). Because we adopted FRE 404 as our own in GRE 404, we consider its pre-2020 notice jurisprudence in our analysis.

[85]    Many jurisdictions "have not been stringent" in requiring the government to provide the "general nature" of the prior-act evidence. *See United States v. Blount*, 502 F.3d 674, 678 (7th Cir. 2007). And courts vary widely in technical requirements. The Ninth Circuit, in *United States v. Erickson*, 75 F.3d 470, 478 (9th Cir. 1996), found notice satisfied when evidence was shared in discovery with no explanation of FRE 404(b) intent. But the D.C. Circuit has come to the opposite conclusion. *See United States v. Spinner*, 152 F.3d 950, 961 (D.C. Cir. 1998) (finding discovery did not qualify as notice where disclosure of document did not reasonably alert defendant to planned FRE 404(b) questions about drug use where no drugs were mentioned).

[86]    Here, the People did not notify Sablan of an intent to use prior-act evidence or a purpose for it. The People argue Sablan received notice of the evidence in pretrial discovery, eliminating any unfair surprise. Tr. at 76 (Jury Trial, Mar. 31, 2021); Appellant's Br. at 26. During the hearing on the motion for a new trial, the People emphasized that in Sablan's opening statement,[12] defense counsel "talked about potential differences in the testimony," so any argument about variance would be erroneous when "he knew the victim would testify the way she did. It was not a surprise." Tr. at 13 (Mot. Hr'g).

---

[12] Sablan's counsel asserted that the jury would vote not guilty when they heard the different versions of M.T.G.'s story: "[W]hen you hear how the girl contradicts herself, how she's told one thing to one person and something else to other people, when you hear that she has told two of her aunts that it did not happen at all, you will not believe the story." Tr. at 28 (Jury Trial, Mar. 30, 2021).

**[87]**     The record shows Sablan had actual notice of the alleged past incident—his counsel explained the allegation to the judge.  Tr. at 72-75 (Jury Trial, Mar. 31, 2021).  Sablan had formal notice that Santos was expected to testify, including to the contents of his report.[13]  *See Erickson*, 75 F.3d at 478 (dismissing defendant's lack-of-notice claim despite his not knowing "specifically what testimony the government planned to use" from witness).  Sablan did not move *in limine* to exclude parts of the report.  Looking at the particular facts, lack of formal notice did not cause the unfair surprise for which the GRE 404(b) notice provision exists.  And while M.T.G.'s stricken statements may have been outside what was expected from the witness, they were not bombshells of damning evidence compared to the expected testimony.

**[88]**     We rule narrowly on the facts here and find the government's notice was not insufficient under GRE 404(b).  This holding should not be read to imply mere discovery sharing constitutes GRE 404(b) notice.  Rather, the government should explicitly disclose GRE 404(b) evidence and its intent to use it for a proper purpose.

**[89]**     The trial court summarily determined that "the People fail[ed] to give notice as required."  Tr. at 7-8 (Jury Trial, Apr. 1, 2021).  The court did not cite support for this holding, discernably consider the Rule's purpose to avoid surprise, reference the Rule's intention to allow a wide variety of notice avenues for Rule 404(b) evidence, or note that Guam's law does not require a specific format.  The court did not sufficiently analyze the notice requirement, and its related decision to exclude the statements was an abuse of discretion.

//

//

---

[13] Here, timing of notice is not at issue: defense counsel says he learned of the report "November 12, 2020, when the prosecutor and an investigator interviewed the victim at the OAG," more than four months before trial began in March 2021.  Appellee's Br. at 12.

### 3. The trial court abused its discretion in excluding M.T.G.'s testimony under GRE 403

[90]     After evaluating admissibility under GRE 404(b), "[t]he trial court must then undertake a balancing test, weighing the admissibility of the evidence using the GRE 403 factors." *Camaddu*, 2015 Guam 2 ¶ 12. GRE 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Guam R. Evid. 403. As an "umbrella rule," Rule 403 excludes unfairly prejudicial evidence regardless of the underlying admission rule. *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1343 (3d Cir. 2002) (citation omitted).

[91]     Evidence of GRE 404(b) prior sexual acts against a child is not inherently unfairly prejudicial in a CSC case. *See Torres*, 2014 Guam 8 ¶¶ 46-47 (conceding that evidence was likely to emotionally impact the jury but was highly probative as to defendant's continuing relationship with child and mitigated by limiting instruction, and was thus admissible). And our analysis of probative value is not limited solely to the factors used by the trial court. *See United States v. Cherer*, 513 F.3d 1150, 1158 & n.3 (9th Cir. 2008) (including "identity" as a probative purpose on appeal where trial court had disregarded this factor). Prior Rule 404(b) sexual acts regularly survive Rule 403 analysis where probative to the issues of continued relationship, consent, intent to entice a minor, plan, modus operandi, sexual intent, and similar sexual behavior. *See, e.g.*, *Torres*, 2014 Guam 8 ¶¶ 46-47; *Cherer*, 513 F.3d at 1157-59.

[92]     Without a detailed explanation, it is difficult to establish how the court decided its GRE 403 holding, which impacts our present abuse-of-discretion analysis. In *Taitano*, we cited our own precedent, following the Ninth Circuit, that "the trial court has a duty to weigh the GRE 403 factors

explicitly." 2015 Guam 33 ¶ 34 (citing *People v. Evaristo*, 1999 Guam 22 ¶ 17). Even under other Ninth Circuit holdings with a less stringent standard, "a trial court commits error where 'the record does not disclose that the trial judge performed the necessary weighing under Rule 403.'" *Id.* (quoting *United States v. Green*, 648 F.2d 587, 593 (9th Cir. 1981) (per curiam)). *But see People v. Tedtaotao*, 2016 Guam 9 ¶¶ 44-45 (requiring GRE 403 factor weighing but not mechanical recitation of the formula).

[93] The trial court found M.T.G.'s stricken testimony "highly prejudicial" but did not elaborate on this finding except for noting that "it contained serious allegations against the defendant." RA, tab 87 at 13 (Dec. & Order); Tr. at 8 (Jury Trial, Apr. 1, 2021). The record lacks any analysis of probative value. *See* Tr. at 8 (Jury Trial, Apr. 1, 2021) (stating that "probative value of the proffered evidence is substantially outweighed by . . . unfair prejudice" but never explaining what the probative value of the evidence was). The court heard the parties briefly argue about GRE 404 and 403, and then dismissed the jury before hearing more about prejudice. Tr. at 64-67, 74-78 (Jury Trial, Mar. 31, 2021). The court apparently conducted a balancing test; however, the finding was conclusory.

[94] Sablan labeled the testimony "unduly prejudicial" because it was inflammatory and offered to prove he was a chronic offender. Tr. at 74 (Jury Trial, Mar. 31, 2021). He asserted the testimony prejudiced him because it pointed to multiple, distinct incidents—one while M.T.G. was asleep with Lynna and one during the same episode as the charged indecent exposure—which he argued unfairly presented a history of abuse. Appellee's Br. at 6-7, 13; Tr. at 82 (Jury Trial, Mar. 31, 2021).

[95] Here, for evidence to be excluded under GRE 403, the probative value of the testimony must be substantially outweighed by the danger of unfair prejudice to Sablan compared with the

jury hearing only the unstricken parts. *See United States v. Jayavarman*, 871 F.3d 1050, 1064 (9th Cir. 2017) (finding evidence not unfairly prejudicial "especially in the context of other evidence adduced at trial"). The stricken testimony included M.T.G. confirming Sablan touched her "private" or her lap with his hand, which, the court notes, is a "serious allegation[]." RA, tab 87 at 13 (Dec. & Order). In the unstricken testimony, M.T.G. testified similarly, stating Sablan touched in her "private" and pointing to her upper thigh. Tr. at 61-62 (Jury Trial, Mar. 31, 2021).

[96]     The People do not explicitly argue probative value. Instead, at trial they argued relevancy, conceding that because of M.T.G.'s age, "It's quite possible she's mixing up some of the incidences [sic]," based on date confusion. *Id.* at 76. However, the People argued that nonetheless, M.T.G.'s testimony of "touching" was consistent with the prosecution's theory and open to impeachment as to her misremembered details. *Id.* at 76-77. On appeal, the People add that testimony about uncharged instances can explain a victim's confusion with dates. Appellant's Br. at 27. The People cite *State v. Nadeau*, 653 A.2d 408 (Me. 1995), to support the assertion that a brief undetailed reference to past abuse in the context of "particularly great" risk of prejudice for sex crimes was "highly probative" and "minimally prejudicial." Appellant's Br. at 27 (quoting *Nadeau*, 653 A.2d at 409-10). More persuasive, *United States v. Cox* recognizes that "other-act evidence in sex-crimes cases is often emotionally charged and inflammatory, and this does not control the Rule 403 analysis." 963 F.3d 915, 925 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1281 (2021) (allowing prior uncharged online messages related to raping and killing children as probative of defendant's identity in charged messages).

[97]     Here, in line with our *Hinton* analysis above, we find M.T.G.'s stricken statements probative to: opportunity (M.T.G. being in Sablan's bedroom), intent (for sexual gratification by

touching M.T.G.'s upper thigh), identity (M.T.G. recognized Sablan's hand), and absence of mistake or accident (as a repeat incident and while M.T.G. was asleep).

[98]    We are not persuaded that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. The stricken statements, at most, described events no more malicious or criminal than the charges themselves. Further, the statements were similar to M.T.G.'s unstricken testimony. The People did not argue to the jury that Sablan was a chronic offender. M.T.G.'s stricken statements did not specify a time of occurrence before the charged incidents, nor did she clearly state the conduct occurred more than once. Sablan does not explain how his defense was prejudiced by these statements. *Cf. Taitano*, 2015 Guam 33 ¶ 35 (finding prejudice in the form of juror confusion where there was no limiting instruction clarifying the extent the jury could use the 404(b) evidence). In line with child sex abuse jurisprudence, any prejudice surrounding these statements did not substantially outweigh their probative value.

[99]    M.T.G.'s statements did not require striking to avoid unfair prejudice, so it is unnecessary to determine whether limiting instructions sufficed.

## V.  CONCLUSION

[100]    We **REVERSE** the trial court's grant of a new trial, reinstate Sablan's conviction, and **REMAND** for further proceedings not inconsistent with this opinion.


/s/                                                                          /s/
ROBERT J. TORRES                                          KATHERINE A. MARAMAN
Associate Justice                                                   Associate Justice



/s/
F. PHILIP CARBULLIDO
Chief Justice